# 21-2904-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

SAMUEL KERSON,

*Plaintiff-Appellant,*

*v.*

VERMONT LAW SCHOOL, INC.,

*Defendant-Appellee.*

———————————

*On Appeal from the United States District Court
for the District of Vermont*

## BRIEF FOR PLAINTIFF-APPELLANT

Steven J. Hyman
Oliver R. Chernin
MCLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, New York 10016
212-448-1100

*and*

Richard I. Rubin
RUBIN, KIDNEY, MYER & VINCENT
237 N. Main St., Ste. 3
Barre, Vermont 05641
802-461-4177

*Attorneys for Plaintiff-Appellant*

## TABLE OF CONTENTS

JURISDICTIONAL STATEMENT .................................................................1

STATEMENT OF THE ISSUES ...................................................................1

STATEMENT OF THE CASE ......................................................................2

   **I.  Nature of the Case and Procedural History** ...............................2

   **II.    Facts Relevant to This Appeal** ................................................3

     a.  The Parties: .................................................................................3

     b.  The Murals .................................................................................4

     c.  Respondent's efforts to destroy, remove or cover the Murals .....7

     d.  The Case Below .........................................................................9

STANDARD OF REVIEW .........................................................................13

   Standard of Review of the Issues on Appeal ..................................13

SUMMARY OF ARGUMENT ....................................................................14

ARGUMENT .............................................................................................19

   **I.   THE INTENTIONAL WALLNG-OFF OF THE MURALS IS A
MODIFICATION OF THE WORK PREJUDICIAL TO APPELLANT'S
HONOR OR REPUTATION** .....................................................19

     A.  VARA Controls the Dispute ....................................................19

     B.  The District Court's Statutory Analysis is Deficient ...............21

     C.  The Exception to the Artist's Rights under VARA in 17 U.S.C.
§106A(c)(2) Does not Apply to Murals Incorporated into a Building ...........30

   **II.   THE ADMITTED DAMAGE TO THE MURALS CAUSED BY THE
ERECTION OF THE WALL IS A DISTORTION, MUTILATION OR
OTHER MODIFICATION FOR PURPOSES OF VARA PREJUDICIAL
TO APPELLANT'S HONOR OR REPUTATION** ........................37

     A.  Introduction ............................................................................37

     B.  The Passage of Time Exception ...............................................38

     C.  There Are Remaining Issues of Material Fact Concerning the Extent of
Damage to the Murals Foreclosing Summary Judgement .................................40

**III. VARA GRANTS APPELLANT THE RIGHT TO PREVENT THE INTENTIONAL DESTRUCTION OF MURALS WHICH ARE RECOGNIZED STATURE** ..................................................................41

**CONCLUSION**...........................................................................................45

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Bd. Of Managers of Soho Int'l. Arts Condo v. City of New York*, No. 01 Civ. 1226 (DAB), 2005 WL 1153752, at *3 (S.D.N.Y. May 13, 2005) ...............................43

*Bloate v. United States*, 559 U.S. 196, 205, n. 9 (2010) ...........................................24

*Carter v. Helmsley-Spear*, 71 F.3d 77, 84 (2d Cir. 1995), *cert. denied*, 517 U.S. 1208 (1996) ...................................................................................... 19, 26, 27

*Carter v. Helmsley-Spear, Inc.*, 861 F. Supp. 303 (S.D.N.Y. 1994), *rev'd on other grounds*, 71 F.3d 77 (2d Cir. 1995), *cert. denied*, 517 U.S. 1208 (1996) ............26

*Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) .....................13

*Cohen v. G & M Realty L.P.*, 320 F.Supp.3d 421 (E.D.N.Y. 2018) *aff'd., Castillo v. G & M Realty L.P.*, 950 F.3d 155 (2d Cir. 2020), *cert. denied*, 141 S.Ct. 363 (2020) ...................................................................................... 39, 40, 42

*Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 456 (2d Cir. 2003) ...................................................................................................................13

*Daniel v. Am. Bd. of Emergency Medicine,* 428 F.3d 408, 423 (2d Cir. 2005).......22

*Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989)...........................23

*English v. BFC&R E. 11ᵗʰ St. LLC,* 1997 WL 746444 (S.D.N.Y. Dec. 3, 1997), *aff'd sub nom on other grounds* 198 F.3d 233 (2d Cir. 1999).............................36

*Fischl v. Armitage*, 238 F.3d 50, 55 (2d Cir. 1997)..................................................14

*Flack v. Friends of Queen Catherine Inc.*, 139 F.Supp.2d 526 (S.D.N.Y. 2001) ...39

*Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ...................................................................................................................13

*Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 111 (2d Cir. 2015) .............................22

*Kelley v. Chicago Park District*, 635 F.3d 290, 306-307 (7th Cir. 2011) ........ 34, 35

*Kerson v. Vermont Law School, Inc.*, 2021WL4142268 (D.C. Vermont 2021) .......3

*Massachusetts Museum of Contemporary Art Foundation, Inc. v. Büchel*, 593 F.3d 38 (1st Cir. 2010) ...................................................................................... 27, 34

*Phillips v. Pembroke Real Estate, Inc.*, 459 F.3d 128, 133 (1st Cir. 2006) 27, 33, 34

*Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, (1997); *Deal v. United States*, 508 U.S. 129, 132, (1993)..............................................................................................23

*Smith ex rel. Estate of Smith v. Fed. Reserve Bank*, 346 F.3d 264, 267 (2d Cir. 2003) ...................................................................................................................13

*Tyler v. Cain*, 533 U.S. 656, 662 (2001)..................................................................23

*United States v. Dauray*, 215 F.3d 257, 260 (2d Cir. 2000)...................................22

*United States v. Rowland*, 826 F.3d 100 (2d Cir. 2016)............................. 21, 22, 24

*Yates v. United States*, 574 US. 528 (2015).................................................... passim

**Statutes**

1338(a) ...........................................................................................................1
17 U.S.C. § 106A .............................................................................. passim
17 U.S.C. § 113(d) ........................................................................... passim
17 U.S.C. §101 .............................................................................................19
28 U.S.C. § 1291 ...........................................................................................1
28 U.S.C. §§ 1331 .........................................................................................1
28 U.S.C. §§ 2201 and 2202 .......................................................................1

**Other Authorities**

H.R. Rep 101-514, (1990).................................................................. passim

## **JURISDICTIONAL STATEMENT**

The district court had jurisdiction over Appellant's claims pursuant to 28 U.S.C. §§ 1331 and 1338(a) because the action arises under the Visual Artists Rights Act (VARA) 17 U.S.C. § 106A, *et seq*. and the Declaratory Judgment Act 28 U.S.C. §§ 2201 and 2202.

The Court of Appeals has jurisdiction pursuant to 28 U.S.C. § 1291. Final judgment disposing of Appellant's claims against Respondent was entered in the district court on November 8, 2021. Appellant filed a timely notice of appeal on November 23, 2021.

## **STATEMENT OF THE ISSUES**

Whether the district court erred in granting Respondent summary judgment and dismissing Appellant's claim, (a) by concluding, as a matter of law, that the intentional and permanent walling-off and blocking from view, of an artistic work of recognized stature, incorporated into a building, does not rise to a cognizable claim under VARA; and (b) by concluding that the likely damage of the artistic work, caused by adverse environmental conditions, intentionally created by Respondent by erecting the wall, fails to raise a genuine issue of material fact as to whether such damage will destroy the artistic work.

## STATEMENT OF THE CASE

### I.     Nature of the Case and Procedural History

This is an appeal of an Order and Final Judgment Order rendered by Chief Judge Geoffrey W. Crawford, of the District Court of Vermont, entered on November 8, 2021. The Order and Final Judgment Order granted Respondent Vermont Law School, Inc.'s (hereinafter "Respondent" or "VLS") motion for summary judgment and dismissed Appellant Samuel Kerson's (hereinafter "Appellant") claims, alleging that Respondent's stated intention to permanently build a wall over his murals, incorporated in a building located on Respondent's campus, violates Appellant's rights under the Visual Artist Rights Act (VARA), 17 U.S.C. § 106A, *et seq*.

Appellant commenced this action by filing a complaint on December 2, 2020, in the U.S. District Court of Vermont. (App'x. A7-A16[1]). On January 20, 2021, Appellant moved for a preliminary injunction to prevent Respondent from moving forward with its stated plan to permanently affix panels to cover Appellant's murals. (Dkt.6). In preparing for the preliminary injunction hearing, on February 4, 2021, the district court requested additional information from Respondent about its plan to install acoustic panels in front of the murals so as to conceal them from view. The information requested by the district court was to file

---

[1] Hereinafter, references to the appendix will be identified as "A" followed by the page number.

proposed construction drawings and Respondent's explanation of its intended course of action if a student, visitor, or any other person asks to see the mural. (A89). On February 12, 2021, Respondent responded to the district court's inquiry by filing construction drawings "showing the design of the acoustic panels and accompanying framework it will employ to permanently conceal Mr. Kerson's mural." The district court denied Appellant's motion by Order dated March 10, 2021. (A102-A114). *Kerson v. Vermont Law School, Inc.*, 2021WL4142268 (D.C. Vermont 2021).

Respondent then moved to dismiss the action pursuant to Fed. R. Civ. P. 12(b)(6) (Dkt.10). The district court, by Order dated March 11, 2021 (A115), converted the motion to dismiss to a motion for summary judgment pursuant to Fed. R. 56. The district court granted the motion for summary judgment on October 20, 2021 (A209-A225) and Final Judgment Order was entered on November 8, 2021 (A226). On November 23, 2021, Appellant filed a timely Notice of Appeal. (A227-A228).

## II.     Facts Relevant to This Appeal

a.  <u>The Parties:</u>

Appellant, an American citizen, has a life-long career of over 50 years as a professional artist. He is particularly known for the painting of large murals. In addition to the artwork which is the subject matter of this appeal, he has been

commissioned to do murals including a three-panel work entitled *Todo Sera Mejor* in Masaya, Nicaragua, as well as another large mural purchased by the State of Vermont entitled *Armed men at the Gates of Paradise*. (A21).

Throughout his career Appellant has used his art to promote the struggle for social justice. (A21, A41). He has achieved international recognition, his artwork having been acquired by such institutions as the Library of Congress, the National Archives of Canada, the British Library and the Bibliotheque Nationale de France as well as the NY Public Library and numerous college and university libraries. Appellant is the recipient of the Brussels Rene Carcan International Prize. (A21, A24).

Respondent, Vermont Law School, is a private law school located in South Royalton, Vermont.

b. The Murals

In 1993 Appellant conceived of the idea of creating two murals (hereinafter, "Murals") commemorating Vermont and its participation in the Underground Railroad helping slaves escape from southern bondage. (A 22). Respondent wrote to Appellant:

> "[W]e are delighted you have chosen Vermont Law School [Respondent] as the site of your mural *The Underground Railroad Vermont* and *The Fugitive Slave*. We agree that the mural will be painted on the walls of the upper level of Jonathan B. Chase Community Center…" (A22)

This letter constituted the only writing with regard to the project. Respondent did not ask Appellant to waive any of his rights under VARA.

Based on this agreement Appellant obtained funding from the Puffin Foundation and put together a team of artists which included a diverse group of well-regarded artists including a Black artist, Kenny Hughes. The Murals were painted directly onto the sheet rock walls in Chase Hall at the Law School. They are large multi-colored panels encompassing two walls each 8' x 24' in size. The first mural is entitled *Slavery* and contains 4 scenes: Capturing people in Africa; Selling humans in the USA; Slave labor; and Insurrection. The second mural entitled *Liberation* contains 4 scenes: Harriet Beecher Stowe, John Brown and Frederick Douglas; Harriet Tubman arriving in Vermont; South Royalton Vermont residents sheltering the slave refugees; and Vermonters providing travel aide to the refugees with the state capital in the background. The Murals were completed in 1993 and signed by Appellant and the other artists involved. (A22-A23). Images of the Murals are shown at A26-A27. *See, also*, Appellant's description of the work at A28-A36.

Respondent celebrated their completion and held a public opening on Martin Luther King's birthday in 1994, inviting the public and press to view the Murals. (A23). The keynote speaker at the event was a well-known civil rights attorney Florynce Kennedy and articles about the mural were featured in such significant

publications as the Christian Science Monitor (A37-A40) and the Boston Globe

(A41).

As the article in the Monitor noted:

Like the Mexican masters, Kerson sees this type of monumental art as a means of social and political commentary….he said he was drawn to his subject by the role of freed slaves and abolitionists in molding a truer democracy. (A38).

and

But the law school, a private, liberal-minded institution in a small town that had actually been a setting for some of the scenes Kerson paints, welcomed the mural and its theme of injustice thwarted. The artist's political aims to provoke questions and discussion through his painting-were right at home there. (A40).

The Boston Globe article contained a similar theme:

Kerson's response to this lie was a desire "to participate in art that celebrates the way black people have contributed to American life." At the same time he wanted to depict Vermont's role in the struggle of the African-American for freedom and autonomy. .. the paintings suggest the work of other muralists who attempt to bring social issues to the forefront…artists like Diego Rivera and Jose Clemente Orozco. (A41).

The Murals achieved nationwide recognition. A book was created entitled

*The Underground Railroad, Vermont and The Fugitive Slave* containing the

images of the murals which has been acquired by numerous institutions across the

country including libraries of the University of Arizona, University of Vermont,

University of Colorado, Dartmouth College and Middlebury College as well as the

New York, Boston and Newark Public Libraries. (A23). The murals are also the subject of a documentary movie available online. (A24).

The Murals have attained recognized stature as attested to by former Vermont Supreme Court Justice Marilyn Skoglund who curated art exhibitions for the Supreme Court (A44-A46) and the Vermont State Curator, David Schutz. (A51-A52). Respondent at oral argument, conceded that the Murals was a work of recognized stature for purposes of VARA (A180) and the district court so found.

c.  Respondent's efforts to destroy, remove or cover the Murals

Since 1994 the murals have been on display in an unblemished state until Respondent embarked upon its effort to destroy, remove, or cover up the Murals. In 2020, more than 25 years after their completion the murals became a point of controversy within the law school. Respondent received complaints from some students that the Murals were offensive characterizing the Murals as "Sambo-like", "racist" and otherwise containing "discomforting" or negative imagery about slavery. (A66-A71, A79-A81).

Other students voiced contrary opinions – *i.e.,*

"Bearing this in mind, I am shocked to see that students at Vermont Law School would want to erase from our campus a memorial designed to depict the savagery of slavery and racism in America in place of something more palatable…" (A99).

In addition, an on-line petition containing hundreds of signatures in favor of the Murals was also circulated. (A97-A98). Nevertheless, Respondent determined to rid Chase Hall of the Murals. (A64).

In July 2020, Respondent publicly announced that it was going to paint over the Murals because of their alleged offensive content. At the time Respondent made this pronouncement it had not reached out to Appellant nor was it even aware of VARA. (A64). On learning of Appellant's objections to its intent to obliterate the Murals, and his rights under VARA, Respondent attempted to have Appellant remove the murals under §113(d)(2). In August 2020, they gave him 90 days' notice to remove the Murals. (A42). However, Appellant's Murals could not be removed without destroying, distorting, mutilating or otherwise modifying the Murals and, therefore, could not be removed (A53-A55). Respondent now concedes, and the district court so found, that the Murals could not be moved consistent with the dictates of §113(d)(2) of VARA (A212).

Having been unable to paint over the murals or have them removed Respondent embarked on other plans to make the Murals permanently "inaccessible" (A64). In November 2020 counsel for Respondent advised Appellant that it would "cover the murals with acoustic panels that will be firmly affixed to the wall structure". (A43). Faced with this plan which would destroy the Murals, Appellant commenced this action.

8

d.  <u>The Case Below</u>

On February 2, 2021, Appellant moved for a preliminary injunction to prevent panels from being glued to the surface of the Murals. (Dkt.6). Thereafter the district court issued a "Request for Additional Information" to determine whether the murals will be "unharmed" and whether there would be any "course of action if a student, visitor or any other person asks to see the mural." (A89). The Respondent submitted construction drawings (A92-A94) and as to the issue of access the Respondent stated:

> "The answer is simple. The mural will be permanently concealed and thus, will not be accessible to visitors or students."  (A89.1)

For the first time the concept of a permanent separate wall enclosing the Murals was now advanced by Respondent. (A90-A94).  Respondent's plans for the wall consisted of a wood frame around the murals on which the acoustic panels would be affixed with the frame entirely enclosing them on all sides (*Id.*). The frame would be less than 2" from the surface of the murals. The wall made no provision for air vents or the ability to have any visual examination of the condition of the Murals. (*Id*). The wall structure used by Respondent was conceived of by the head of maintenance at Vermont Law School, Jeffrey Knudsen. He had no concern about the Murals other than permanently removing them from view:

9

A. …I never considered to protect or save the mural so that was never in my thoughts; it was just to cover it (A133, Knudsen Dep., p. 24, l. 17-18); and

Q. So your, your concerns were not with the mural, your concerns were covering it as cheaply and effectively as possible; is that correct?

A. Yep (A135, Knudsen Dep., p. 33, l. 14-18).

Knudsen admitted that he came up with the use of acoustic panels "out of the blue" (A132, Knudsen Dep, p. 18, l. 16-18) and that his knowledge of the panels came from his on-line Google research. As he stated: "Google knows everything". (A133, Knudsen Dep, p. 25, l. 5-8).

Even when Respondent proposed to add a humidity monitor to the wall installation, Knudsen indicated he had no knowledge of how it worked or what would be accomplished by having it added. According to Knudsen, the addition of such a monitor was suggested by Respondent's attorneys with no other expert input. (A140, Knudsen Dep., p. 50, l14-15). He had no knowledge or ability to correct any problems that the monitor might document. (A140, Knudsen Dep., p. 51, l. 9-12).

After Appellant's motion for preliminary injunction was denied and Respondent's motion to dismiss was converted by the court to a summary judgment motion. The district court gave Appellant the opportunity to assess the impact the wall would have on the integrity of the Murals. Appellant engaged experts to consider how the proposed wall might destroy, distort, mutilate or

otherwise modify the Murals. A renowned expert, Harriet Irgang Alden, noted that acoustic panels contained material that could create an acidic atmosphere from the adhesions used in their manufacture by emitting gases harmful to the paint surface. (A126).

Emily Phillips, an expert in art conservation, went further in an analysis of the wall's likely effect on the Murals. According to Phillips, Respondent's proposal for the wall did not consider the preservation of the Murals. The goal was to create a barrier as cheaply as possible without any regard to its impact on the Murals. She said the use of the acoustic tiles had never to her knowledge been used to enclose artwork and was never subjected to standard testing methods used in the industry to see what their impact would be on the paint surface. She concurred with Alden that panels contain substances that could emit toxic gases harmful to the Murals. She further found that the proximity of the wall to the Murals and the lack of permeability was harmful to the Murals and that the lack of access to the Murals prevented monitoring and the ability to repair damage that would occur. (A144-A149).

In her deposition Phillips reaffirmed that the wall as proposed was likely to cause damage to the Murals.

> Q.    Okay. So looking at all of these factors holistically, do you have an opinion whether it's more likely than not that damage will occur to the surface of the mural if it is constructed as proposed by Vermont Law School?

A.   Yes; I think I have stated that in my Declaration, yes.

Q.   The answer is you'd have an opinion and what is your opinion.  I'm not asking in terms of percentage; I'm asking whether it's more likely than not in your opinion that damage will occur?

A.   I think when you lay out the entire system, I am – there is concern that there is the potential risk for damage, yes.

Q.   Is it more likely than not that it will occur?

A.   Oh, I would say, I would say more likely, just given – yes; yes.

(A170, Phillips Dep., p. 71, l. 3-21).

Respondent offered no contrary evidence. At the hearing before the court on

Respondent's motion for summary judgment, counsel for Respondent stated:

Ms. Phillips has offered opinion testimony that this plan to install acoustic panels over the mural, not touching it, but enclosing it full, is not consistent with best practices in the field of art conservation. We can concede that point, at least for today's hearing for summary judgment. (A178).

And

She doesn't know the extent of any damage or deterioration that might occur, but she has said there is a risk, and for purposes of summary judgment, the Court has to accept that fact, that it is , there is at least a genuine dispute as to whether there's a risk of deterioration over time. So we concede that point for today. (A179).

Respondent's counsel also argued at the hearing that while any damage to

the Murals caused by the wall might be a modification it did not matter because no

one would see the deterioration. As he stated:

So the potential ground for liability here is modification, and the only sort of modification that is relevant under VARA is modification that reflects in a prejudicial manner on the artist's honor or integrity. Here we're going to cover up the mural. No one will see it. If there are changes over time it's

12

hard for me to comprehend how they could reflect in a way that would be prejudicial to the artist's reputation. (A184-A185).

The district court granted Respondent's motion for summary judgment.

## STANDARD OF REVIEW

### Standard of Review of the Issues on Appeal

The Court of Appeals reviews *de novo* the grant of summary judgment. *Smith ex rel. Estate of Smith v. Fed. Reserve Bank*, 346 F.3d 264, 267 (2d Cir. 2003), viewing the evidence in a light most favorable to the Appellant to determine whether the record reveals the existence of any material issue of fact that would bar such relief. *Commercial Union Ins. Co. v. Alitalia Airlines*, *S.p.A*., 347 F.3d 448, 456 (2d Cir. 2003); *Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1223-24 (2d Cir. 1994) (on *de novo* review of summary judgment, "all ambiguities must be resolved and all inferences drawn in favor of [the non-moving party]").

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party in favor of the non-moving party. *Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d, at 456; *see also, Gallo*, 22 F.3d, at 1223. Summary judgment is improper if any evidence in the record from any source would enable a reasonable inference to be drawn in favor of the non-moving party. *See, Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994). As it bears emphasizing, "[c]redibility

assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *Fischl v. Armitage*, 238 F.3d 50, 55 (2d Cir. 1997).

## **SUMMARY OF ARGUMENT**

This case presents the unique question as to whether, under VARA, 17 U.S.C. § 106A, *et seq.*, an artistic work of recognized stature, incorporated into a building, can be intentionally and permanently walled off and blocked from view, because the institution that commissioned the work now finds it offensive and unworthy of public display.

Appellant's murals, each 8' x 24', entitled *Vermont, The Underground Railroad and Vermont and the Fugitive Slave* (the "Murals"), since 1993, have been incorporated into a wall at Chase Hall on the campus of Respondent Vermont Law School ("VLS"). The Murals depict the evils of slavery and the efforts of abolitionists and Vermonters to aid slaves seeking freedom on the Underground Railroad. The Murals are works of recognized stature and long celebrated at VLS and the community at large.

In 2020, after receiving complaints from students about the purported cartoonish depiction of enslaved African people, VLS stated its intention to whitewash and subsequently to remove the Murals. After VLS realized that these options were clear violations of VARA, VLS decided to permanently conceal the

Murals by entombing them behind a wall of acoustical panels so they would be inaccessible.

Appellant contends that VLS's actions violate VARA, which confers upon artists the right:

> (A) to prevent any intentional distortion, mutilation, or other modification of that work which would be prejudicial to his or her honor and reputation, and any intentional distortion, mutilation, or modification of that work is a violation of that right, and
>
> (B) to prevent any destruction of a work of recognized stature, and any intentional or grossly negligent destruction of that work is a violation of that right.
>
> 17 U.S.C. § 106A(a)(3)(A) and (B).

VLS's construction of a wall permanently concealing the Murals is an intentional distortion, mutilation, or other modification which is prejudicial to his honor and reputation. Appellant also contends the wall will likely cause damage to the Murals and further that the Murals as works of recognized stature may suffer destruction which he seeks to prevent.

Based on a contorted reading of the statute, the district court held that Respondent's action of permanently concealing the work is neither a modification nor a destruction of the work, actionable under VARA. Alternatively, the district court held that even if concealment is deemed to be a modification, it is permitted modification under the "public presentation" exception of 17 U.S.C. § 106A(c)(2). Furthermore, even though the record indisputably confirms that the Murals will likely be damaged once concealed by the wall, the district court concludes that

15

notwithstanding Respondent's knowing action to create a toxic environment, such distortion, mutilation, or other modification of the Murals is not actionable under the "passage of time" exception of 17 U.S.C. § 106A(c)(1). All these holdings are wrong.

Although the meaning of "modification", as used in the statute is ambiguous, (the "public presentation" exception to modification specifically refers to lighting and placement, neither of which involve physical changes to the artwork itself) the district court relied on the term's dictionary definition holding that modification must entail a gradual change to the artwork itself. This reasoning is antithetical to the teachings of *Yates v. United States*, 574 US. 528 (2015) ("[t]he plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole."). A proper statutory analysis, including a reference to the legislative history of VARA, must conclude that the intentional act of walling-off the Murals is a modification.

The district court further erred in concluding that the concealment of the Murals is permitted modification under the "public presentation" exception, ignoring that the premise of this exception in VARA is that artwork can be moved in some fashion--that is, art is not permanently affixed or integrated in such a way that the mere act of moving it would destroy it. Since the Murals are incorporated

16

into a building and cannot be moved without destroying them, the "public presentation" exception is inapplicable.

The district court also erred in failing to analyze the relevance of 17 U.S.C. § 113(d), which provides for how VARA deals with artwork incorporated into a building, to the facts of this case. While the district court agreed that the exceptions for removing the Murals set forth in that section have not been met, that is the Murals cannot be removed from the building without destroying them and Respondent did not get a waiver from Appellant permitting the concealment or removal of the Murals, in effect, the district court's decision improperly expands the options available to building owners. They can, in effect, accomplish the equivalent of removal of any such artworks not permitted by VARA, by permanently covering them up as long as the cover-up does not physically touch the artwork.

The district court was also wrong concluding that the "passage of time" exception forecloses any claim based on the likely adverse changes which damage the Murals, caused by their entombment. It is Respondent, not the passage of time, which affirmatively creates the toxic situation that will damage the surface of these paintings.

In addition to the prohibitions contained in 17 U.S.C. § 106A(a)(3)(A), Appellant has the right to <u>prevent</u> Respondent's wall from destroying his work of

recognized structure. 17 U.S.C. § 106A(a)(3)(B). The district court failed to consider that the ultimate impact of Respondent's wall can be the destruction of the Murals and that walling-off the Murals to permanently block them from view is the same as destroying them as contemplated by the statute.

Finally, and most fundamentally, the district court's decision, if left undisturbed, will allow Respondent to achieve what VARA was intended to prevent, i.e., the intentional destruction, distortion, mutilation, or other modification of artwork, which is prejudicial to the artist's reputation or honor.

On the one hand, Respondent argues, and the district court concurs, it can put up a permanent wall to block Appellant's artwork from view because there is no modification or destruction under 17 U.S.C. § 106A(b)(1)-(2) and, therefore, Appellant has no remedy even if his honor and reputation is severely damaged. Yet, on the other hand, Respondent argues, and the district court concurs, that once the wall is built whatever destruction or modification occurs is irrelevant since no one can see what is happening to the Murals and, therefore, there can be no prejudice to Appellant's honor and reputation. This argument is unsustainable. It renders VARA impotent to protect art incorporated in a building, permitting an owner to cover up unwanted Murals, and then claim that there is no damage to the author's reputation as the work no longer can be seen.

## **ARGUMENT**

I.     **THE INTENTIONAL WALLNG-OFF OF THE MURALS IS A MODIFICATION OF THE WORK PREJUDICIAL TO APPELLANT'S HONOR OR REPUTATION**

### A. VARA Controls the Dispute

This action arises under the Visual Artist Rights Act (VARA), 17 U.S.C. §106A, *et seq*. Congress passed VARA in 1990, as an amendment to the Copyright Act. VARA extends to the author of a work of visual art the legal protection of their moral rights of attribution and integrity. *Id*. The Copyright Act defines a work of visual art as "a painting, drawing, print, or sculpture, existing in a single copy," or "in a limited edition of 200 copies or fewer." 17 U.S.C. §101. Murals are works of visual art covered by VARA. *Carter v. Helmsley-Spear*, 71 F.3d 77, 84 (2d Cir. 1995), *cert. denied*, 517 U.S. 1208 (1996).

Since the passage of VARA, artists have had the right:

(A)     to prevent any intentional distortion, mutilation, or other modification of that work which would be prejudicial to his or her honor or reputation, and any intentional distortion, mutilation, or modification of that work is a violation of that right 17 U.S.C. § 106A(a)(3)(A), and

(B)     to prevent any destruction of a work of recognized stature, and any intentional or grossly negligent destruction of that work is a violation of that right. 17 U.S.C. § 106A(a)(3)(B).

VARA's protection expressly extends to permanent murals —that is, to works that have been "incorporated in or made part of a building in such a way that

removing the work from the building will cause the destruction, distortion, mutilation, or other modification of the work." 17 U.S.C. § 113(d)(1)(A). For murals incorporated in or made part of a building after VARA's enactment, as is the case here, this protection applies unless a) the artwork can be removed without the destruction, distortion, mutilation, or other modification of the work or b) the artist and the building owner have executed a "written instrument" that "specifies that installation of the work may be subject to destruction, distortion, mutilation, or other modification, by reason of its removal." 17 U.S.C. § 113(d)(1)(B). Respondent had the opportunity to negotiate a waiver at time of installation but did not avail itself thereof. Now, two decades later, Respondent is asking the courts to remedy its failure to do so. Here, the Murals that are the subject of this action are incorporated in Chase Hall in such a way that removal will cause their destruction and Appellant has not acquiesced to the Murals' removal.

The rights conferred to the author of a work of visual art by 17 U.S.C. § 106A(a) are distinct from ownership of any copy of that work, or of a copyright or any exclusive right in that work. 17 U.S.C. § 106A(e)(2). Thus, for works of visual art installed in a building, "whether the rights set forth in paragraphs (2) and (3) of 17 U.S.C. § 106A(a) apply, is controlled not by who owns the building at any given time, but by the fact of installation of a work in a building and the

circumstances surrounding that installation." H.R. Rep 101-514, p. 6930 (1990)

(hereinafter "House Report")).

### B. The District Court's Statutory Analysis is Deficient

The district court erred in its interpretation of Appellant's rights under VARA by holding that building a wall to permanently block his Murals from view was not a modification under the statute. After making this determination, the district court never reached the second prong of the statutory language, namely, whether such a wall prejudiced Appellant's honor and reputation. By singularly focusing on its perceived definition of "modification", *i.e.,* that it "generally refers to an incremental change to the object at issue" (A219), the district court failed to follow basic rules of statutory construction as outlined by the Supreme Court in of *Yates v. United States*, 574 U.S. 528 (2015), and amplified in *United States v. Rowland*, 826 F.3d 100 (2d Cir. 2016).

A proper analysis of the use of the term "modification" within VARA and the context in which it is used, consistent with the purpose and intent of the statute, requires a different conclusion. Appellant submits that a proper analysis will conclude that the erection of a wall permanently covering up Appellant's Murals, so that they cannot be seen, based solely on Respondent deeming the Murals offensive, is a modification, prejudicial to Appellant's honor or reputation. Accordingly, Appellant has a viable claim under VARA to prevent the walling-off

of the Murals and the grant of summary judgment in favor of Respondent must be reversed.

The district court's holding starts and ends with the conclusion that Appellant has no claim under VARA because the walling-off of the Murals is not a modification, since it does not alter the artwork itself. This conclusion is based on an extremely narrow interpretation of the term "modification" as used in the statute and ignores the basic rules of statutory construction.

*Rowland* explains the proper approach to statutory interpretation while *Yates* clarifies how the plainness or ambiguity of statutory language is determined. *Rowland* explains the procedure as follows: "Our starting point in statutory interpretation is the statute's plain meaning, if it has one." *Id*, at 107, *citing, United States v. Dauray*, 215 F.3d 257, 260 (2d Cir. 2000). The plain meaning "does not turn solely on dictionary definitions of [the statute's] component words," but is also determined by "the specific context in which that language is used, and the broader context of the statute as a whole" *Id*, *citing, Yates v. United States*, 574 U.S. 528, 537 (2015). If the meaning is plain, the inquiry ends there. *Id, citing*, *Daniel v. Am. Bd. of Emergency Medicine,* 428 F.3d 408, 423 (2d Cir. 2005). If the statutory provision is ambiguous, however, "we then turn to canons of statutory construction for assistance in interpreting the statute." *Id, citing*, *Greathouse v. JHS Sec. Inc.*, 784 F.3d 105, 111 (2d Cir. 2015). We resort to legislative history

22

only if, after consulting canons of statutory instruction, the meaning remains ambiguous. *Id, citing*, *Daniel*, 428 F.3d at 423.

*Yates* clarifies how to address the threshold determination of ambiguity, explaining, "[w]hether a statutory term is unambiguous, however, does not turn solely on dictionary definitions of its component words. Rather, "[t]he plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole." *Citing, Robinson v. Shell Oil Co.,* 519 U.S. 337, 341, (1997); *Deal v. United States*, 508 U.S. 129, 132, (1993) (it is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used"). Ordinarily, a word's usage accords with its dictionary definition. In law as in life, however, the same words, placed in different contexts, sometimes mean different things." 574 U.S. 528, 537-538

Thus, although dictionary definitions of the words bear consideration, they are not dispositive of the meaning. *Yates,* at 538. *Accord, Tyler v. Cain*, 533 U.S. 656, 662 (2001) ([We do not] "construe the meaning of statutory terms in a vacuum."); *Davis v. Michigan Dept. of Treasury*, 489 U.S. 803, 809 (1989) ([We interpret particular words] "in their context and with a view to their place in the overall

statutory scheme."); *Bloate v. United States*, 559 U.S. 196, 205, n. 9 (2010). (Dictionary definition of a disputed term cannot control).

Here, it is abundantly clear from the wording of the statute that the word "modification" is an ambiguous term that is not self-defining. As used in 17 U.S.C. §106A(a)(3) "other modification" of a work, which would be prejudicial to the author's honor or reputation, grants the author the right to prevent such other modification. This subsection does not provide any further definition of the term.

VARA provides more guidance to what "modification" comprises, when identifying exceptions to the author's rights. These are set forth in 17 U.S.C. §106A(c)(1) & (2), as follows:

(c) Exceptions

(1) The modification of a work of visual art which is the result of the passage of time or the inherent nature of the materials is not a distortion, mutilation, or other modification described in subsection (a)(3)(A).

(2) The modification of a work of visual art which is the result of conservation, or of the public presentation, including the lighting and placement, of the work is not a destruction, distortion, mutilation, or other modification described in subsection (a)(3) unless the modification is caused by gross negligence.

These examples of excluded modification confirm that modification is not limited to physical changes of the artwork itself, but rather includes changes in how the artwork is presented. In view of this ambiguity, *Yates* and *Rowland* permit resorting to legislative history to determine the meaning of the term.

The legislative history confirms that "modification" is to be construed broadly and must be considered in conjunction with how the modification impacts on the author's honor or reputation. The district court's analysis is devoid of any consideration of this essential element of Appellant's claim, focusing only on the form of the action taken by Respondent and not on how that action would impact on Appellant's honor and reputation in the artwork.

Congress had a significantly broader view of what is covered by modification. It is not a word that is defined in a vacuum. As the House Judiciary Subcommittee on Courts, Intellectual Property and Administration of Justice noted in its report on the proposed VARA legislation and, as ultimately reflected in the statute, modification, to be actionable, must be read in conjunction with prejudice to the author's honor or reputation. ("Modifications are prohibited only if they would be prejudicial to the author's honor or reputation, and if they are the result of an intentional or negligent act or omission with respect to the covered work." House Report, p. 6924-6925.)

Turning to the terms "honor or reputation", the Committee stated that the best approach is to

> [F]ocus on the artistic or professional honor or reputation of the individual as embodied in the work that is protected. The standard used is not analogous to that of a defamation case, where the general character of the plaintiff is at issue. In a suit for a violation of the rights accorded under H.R. 2690, any evidence with regard to the latter is irrelevant. *Id*, at p. 6925.

The Committee further stressed the need to be flexible, stating,

> The formulation whether harm to honor or reputation exists must of necessity be flexible. <u>The trier of fact must examine the way in which the work has been modified and the professional reputation of the author of the work</u>. Rules 701–706 of the Federal Rules of Evidence permit expert testimony on the issue of whether the modification affects the artist's honor or reputation. While no per se rule exist, modification of a work of recognized stature will generally establish harm to honor or reputation. *Id*, at pp. 6925-6926 *(emphasis supplied)*.

In determining what would be "prejudicial to the artist's honor and reputation," courts will consider whether such alteration would cause injury or damage to the artist's good name, public esteem, or reputation in the artistic community. *Carter v. Helmsley-Spear, Inc.*, 861 F. Supp. 303 (S.D.N.Y. 1994), *rev'd on other grounds*, 71 F.3d 77 (2d Cir. 1995), *cert. denied*, 517 U.S. 1208 (1996)

The Committee teaches that the artists' rights to protect their works is linked with prejudice to the artists' honor or reputation, consistent with the underlying purpose of VARA, namely, to protect the moral rights of the artists. As explained by Congress, the purpose of the legislation was to

> protect both the reputations of certain visual artists and the works of art they create. It provides these artists with the rights of "attribution" and "integrity." The former ensures that artists are correctly identified with the works of art they create, and that they are not identified with works created by others. <u>The latter allows artists to protect their works against modifications and destructions that are prejudicial to their honor or reputations.</u> These rights are analogous to those protected by Article 6*bis* of the Berne Convention, which are commonly known as "moral rights". The theory of moral rights is that they result in a climate of artistic worth and honor that encourages the author in the arduous act of creation. Artists' rights are consistent with the purpose behind the copyright laws and the Constitutional provision they implement: "To promote the

26

Progress of Science and useful Arts.". House Report, p. 6916 (*emphasis supplied*).

Introducing VARA, Representative Robert W. Kastenmeier, Chairman of the

House Judiciary Subcommittee on Courts, Intellectual Property, and the

Administration of Justice, stated that:

> The Visual Artists Rights Act is a pragmatic response to a real problem. It is directed toward development of Federal rights that would enable visual artists to protect the integrity of their works and the fact of their authorship. We should always remember that the visual arts covered by this bill meet a special societal need, and that their protection and preservation serve an important public interest.

> Representative Edward Markey concurred, stating,

> Artists in this country play a very important role in capturing the essence of culture and recording it for future generations. It is often through art that we are able to see truths, both beautiful and ugly. Therefore, I believe it is paramount to the integrity of our culture that we preserve the integrity of our artworks as expressions of the creativity of the artist. *Id,* at pp. 6915-6916

The courts, including the Second Circuit, have universally recognized

Congress's intent. *Massachusetts Museum of Contemporary Art Foundation, Inc.*

*v. Büchel*, 593 F.3d 38 (1st Cir. 2010) ("Passed in 1990, the Visual Artists Rights

Act, 17 U.S.C. § 106A, was an amendment to the Copyright Act that protects the

"moral rights" of certain visual artists in the works they create, consistent with

Article 6*bis* of the Berne Convention. *Citing*, *Phillips v. Pembroke Real Estate,*

*Inc.*, 459 F.3d 128, 133 (1st Cir. 2006). *In Carter v. Helmsley–Spear, Inc.*, 71 F.3d

77, 83 (2d Cir. 1995), the Second Circuit, citing VARA's legislative history,

explained that VARA: protects both the reputations of certain visual artists and the works of art they create. It provides these artists with the rights of "attribution" and "integrity", which are analogous to those protected by Article 6 *bis* of the Berne Convention. *Id*. at 83.

Applying this analysis here, it inexorably leads to the conclusion that what Respondent has done here is precisely the type of action that VARA meant to protect against. First it is beyond cavil that Respondent's wall has prejudiced Appellant's honor and reputation in his Murals.  Respondent lauded his work when it was painted in 1994.  At the time and thereafter Appellant's work reflected what was publicly recognized as his commitment to social justice and racial equality. His artwork was to commemorate Vermont and its participation in Underground Railroad helping slaves escape from southern bondage and to celebrate the way that Black people have contributed to American life.

Respondent's act to now cover up the Murals claiming it to be offensive, goes to the very heart of Appellant's honor and reputation.  It is important to note that Respondent is free to characterize Appellant however they want to and otherwise criticize and denounce his work.  What they cannot do is permanently cover it so that the world can no longer see it.  There can be no greater attack on his honor and reputation then what Respondents are doing.

28

It is in this context one needs to assess whether the permanent wall is a modification of his art.  Murals that were visible and viewed now are permanently covered to not be seen again.  Respondent's expressed intent to make them inaccessible is no different than whitewashing them.

It is important to note that by its own admission Respondent's covering of the artwork is solely because of content.  In that this case is unique. All other cases litigated under VARA involved acts in which the changes to the artwork were the by-product of other economic or business reasons. Here, it is the only reason.

The restrictive definition that the district court attributes to "modification", to wit, the narrow focus on the artwork itself without considering the impact on the author's honor or reputation is error. The district court's attempt to avoid this issue merits specific mention. Rather than considering how the act of walling-off the Murals prejudices Appellant's honor or reputation, the district court concludes that once the wall is erected, Appellant has no basis for a claim based on the right of integrity because the Murals cannot be seen at all. (A221). (Respondent argues similarly, *e.g.*, that there can be no effect on Appellant's honor or reputation, once the Murals are no longer seen. A184-A185.)

Congress pointed out the fallacy of the district court's and Respondent's conclusions, noting that

> [s]ome Berne members do not include destruction of a work within the right of integrity because, theoretically, once the work no longer exists, there can be no effect on an artist's honor or reputation ... [Congress] provided for the right of

attribution and by protecting against both mutilation and destruction. House Report, p. 6926.

As the walling-off of the Murals to permanently prevent them from being seen is tantamount to its destruction, the prejudice to Appellant's honor or reputation has occurred as soon as the wall has been erected, announcing to the world that the Murals are offensive, racist and unworthy to be viewed.

Not only has this denigrated the value of the work itself, it also has undoubtably tarnished Appellant's reputation as an artist committed to progressive causes. Unless the decision below is reversed and the wall removed, Appellant's reputation or honor will continue to be prejudiced.

### C. The Exception to the Artist's Rights under VARA in 17 U.S.C. §106A(c)(2) Does not Apply to Murals Incorporated into a Building

#### 1. Introduction

The district court's second rationale for its narrow definition of "modification" is to reference the "public presentation" exceptions, set forth in 17 U.S.C. § 106A(c)(2). However, that exception dealing with movable art has no application to Appellant's Murals that are incorporated into the building.

At the outset it must be noted that even the district court agreed that this section has no application to these Murals. Thus, in its initial decision denying Appellant's motion for preliminary injunctive relief the district court stated:

VARA contains exceptions not directly relevant here. These include the modification of an artwork through the passage of time or the inherent nature of the materials and modification due to conservation or the conditions of public

presentation such as lighting and placement as well as the exclusion of reproductions. 17 U.S.C. § 106A(c)(1)-(2). (A106)

The district court does not give any rationale for this sudden change of legal analysis. Its holding that "[s]ince the manner in which an artwork is shown is not a modification, the manner in which it is *not* shown is not a modification for purposes of the VARA either." (A221, *emphasis in original*) adds little clarity to its rationale and has turned the meaning of the section on its head. We submit that the district court had it right the first time and that §106A(c)(2) is not relevant to this case.

What the district court correctly recognized in its preliminary injunction decision referring to 17 U.S.C. § 106A (c)(2) is that VARA distinguishes between movable art and art incorporated into a building such as the Murals. First, Congress created a separate category for art incorporated into a building under 17 U.S.C. § 113(d) that does not permit Respondent's entombment of the Murals; second, courts have uniformly acknowledged that §106A(c)(2) as reflected in the legislative history, applies to movable art and not fixed art such as the Murals; and third, the public presentation exception does not apply where there is "gross negligence", which is clearly evident in this case by the intentional erection of the wall.

The fact that the Murals are works of art incorporated into a building give them unique status under VARA not accorded movable art. The provisions of 17 U.S.C.

31

§ 113(d) set forth how a building owner and artist are to deal with such art. A building owner can only remove a work if (a) the work of visual art which is a part of such building can be removed from the building without the destruction, distortion, mutilation, or other modification of the work, (b) if the author in a written instrument agrees that installation of the work may subject the work to destruction, distortion, mutilation, or other modification, by reason of the removal, or (c) or if the work was installed in a building prior to passage of VARA in 1990. The district court correctly found that this exception does not apply here (A218), *e.g.,* the Murals were installed after 1990, they cannot be removed without destroying it, and Appellant did not waive his rights. The Murals therefore must remain in place.

The court's subsequent comparison between movable art being moved to storage and removing from view fixed art that cannot be moved (A224) is inapposite. That is why Congress specifically limited what could be done with fixed artwork. The district court argues that walling-off the murals is akin to removing a painting from a gallery and placing it into storage (A224). But a change of location of a movable piece of art is not comparable to fixed art incorporated in a building being permanently walled off. Congress clearly recognized this distinction by creating a special category for the latter.

By engrafting the "public presentation" exception for movable art into 17 U.S.C. § 113(d), the district court has in effect granted building owners an additional recourse to remove artworks from their buildings not contemplated under VARA. This judge created resource has no basis in VARA, in general, or in 17 U.S.C. § 113(d), specifically.

The district court's conclusion is contrary to VARA's legislative history, as well as contrary to the finding of other courts. The legislative history of 17 U.S.C. §106A(c)(2), the so-called public presentation exception, was included in VARA to allow museums and galleries to "continue to have normal discretion to light, frame, and place works of art" (House Report, p. 6927). Respondent is neither a museum nor a gallery, thus, equating Respondent's action with a museum's removal of a work of art from display (A220-A221), is misplaced.

The courts further clarify what the public presentation exception entails. In *Phillips v. Pemroke Real Estate, Inc.*, 459 F.3d 128, 141 (1st Cir. 2006), the court explained, "the premise of the public presentation exception is artwork that can be moved in some fashion, such as paintings or sculptures—that is, art that is not permanently affixed or "integrated" in such a way that the mere act of moving it would destroy it. The possibility of change without destruction is implicit in the public presentation exception."

33

Here, the Murals are integrated into the building and will be destroyed if moved. Thus, the public presentation exception does not apply. The district court's reliance on the "public presentation" exception is diametrically contrary to *Phillips,* as the district court relies on it despite the fact that the Murals are integrated into Chase Hall in such a way that the mere act of removal would destroy them.

*Kelley v. Chicago Park District*, 635 F.3d 290, 306-307 (7th Cir. 2011) explains "Nor does application of the public-presentation exception operate to eliminate *every* type of protection VARA grants to creators of site specific art; the exception simply narrows the scope of the statute's protection for all qualifying works of visual art. The exception basically provides a safe harbor for ordinary changes in the public presentation of VARA-qualifying artworks. … Moreover, some of VARA's protections are unaffected by the public-presentation exception. An artist's right of integrity can be violated in ways that do not implicate the work's location or manner of public presentation..." (emphasis in original). The walling-off of the Murals obviously is significantly more than an "ordinary change" in public presentation. Rather, it terminates the public presentation.

The district court's reliance on *Massachusetts Museum of Contemporary Art Found., Inc. v. Büchel*, 593 F.3d 38 (1st Cir. 2010) for the proposition that the "mere covering of the artwork by the Museum … cannot reasonably be deemed an

intentional act of distortion or modification", is questionable. *MoCA*, concerned a museum's attempt to accommodate an artist by concealing an incomplete work, because he believed that exhibiting the work in that state would be detrimental to his honor and reputation. The <u>temporary</u> tarp failed to fully cover the art as demanded by the artist, which is the inapposite situation presented in the case at bar.

Moreover, the "public presentation exception" is not open ended. The exception does not apply where the modification is the result of "gross negligence". Respondent's wall goes even beyond gross negligence since its sole intention is to remove the Murals from view. The district court in considering the language of 106A(c)(2) begrudgingly acknowledges that the wall may, in fact, be a modification but it ignores this caveat as to the intent of Respondent when invoking the exception. While the meaning of the gross negligence exception to the exception has not been the subject of any significant commentary, the court in *Kelley* does note that

> "…(t)he artist has no cause of action unless through gross negligence the work is modified, distorted, or destroyed in the process of changing its public presentation" *supra, at* p.306-7

Respondent's entombing of the Murals constitutes an act that takes it out of the permitted modification exception set forth in 17 U.S.C. § 106A(c)(2).

35

The district court's reliance on *English v. BFC&R E. 11th St. LLC,* 1997 WL 746444 (S.D.N.Y. Dec. 3, 1997), *aff'd sub nom on other grounds* 198 F.3d 233 (2d Cir. 1999), is unavailing. In *English* the mural was unauthorized, the building which would block the mural was being constructed by a third party who had no relationship to the art and, thus, could not have entered into any agreement with the artist under 17 U.S.C. §113(d) and was legitimately developing its property so that blocking of the mural was an unintended byproduct of the use of the property. Moreover, the mural in *English* was on the outside of a building. This important distinction was relied upon in dismissing the VARA claim on public policy grounds. (A "contrary holding would effectively allow building owners to inhibit the development of adjoining parcels of land by simply painting a mural on the side of their building. Such an interpretation of the statute would stretch VARA to its constitutional limits (if not beyond) and raise serious public policy concerns.") Obviously, where the mural is on an internal wall, this public policy concern is inapplicable.

In sum, we submit a proper reading of VARA requires reversal of the district court's finding that public presentation exception is applicable here. Contrary to the lower court's holding, the wall is a modification of Appellant's Murals that will prejudice his honor and reputation in it.

36

## II. THE ADMITTED DAMAGE TO THE MURALS CAUSED BY THE ERECTION OF THE WALL IS A DISTORTION, MUTILATION OR OTHER MODIFICATION FOR PURPOSES OF VARA PREJUDICIAL TO APPELLANT'S HONOR OR REPUTATION

A. Introduction

The unrebutted evidence of record, supported by expert submissions, establishes that Respondent's erection of the wall and sealing off the Murals, will cause a toxic environment that likely will damage the Murals. At the summary judgment stage, the court is required to accept as true Appellant's experts' opinions, and draw any inferences in favor of Appellant, the non-moving party. (*See*, Standard of Review of the Issues on Appeal, *supra*.)

The experts opined, and the district court recognizes (A224), that the wall, based on its mode of construction, its proximity to the Murals, the selected material, and the impossibility of monitoring and correcting damage, when it occurs, will create a toxic condition that likely will cause environmental damage to the Murals.

While ultimately there may be some factual dispute as to the extent of the damage, Appellant submits, that regardless of the extent, it will amount to a distortion, mutilation, or other modification for purposes of VARA, prejudicial to Appellant's honor or reputation. At minimum, it confirms that there is a dispute as to a material issue of fact that precludes the grant of summary judgment.

The district court concludes that the likely damage to the Murals is not actionable, as a matter of law, invoking the "passage of time" exception, § 106A(c)(1), which states "[t]he modification of a work of visual art which is the result of the passage of time or the inherent nature of the materials is not a distortion, mutilation, or other modification described in subsection (a)(3)(A)." (A222). Appellant submits that the district court's conclusion that his claim is precluded as a matter of law, is not supported by the fact or the law.

B. <u>The Passage of Time Exception</u>

In its analysis of the "passage of time" exception, the district court focuses entirely on the environmental conditions resulting from the erection of the wall that will likely cause damage to the Murals. Initially, this mischaracterizes what Respondent is doing here. While the proximate cause of the deterioration of the walled-off Murals will be the toxic environmental conditions, it ignores the fact that Respondent is intentionally creating the toxic conditions. Thus, the modification of the work, is not the result of the "passage of time."

17 U.S.C. §106A(c)(1) is a shield to protect art proprietors from facing litigation because the artwork has deteriorated due to natural causes. It is not a sword that enables the art proprietors to take affirmative action to modify, distort, or mutilate the art.

The district court's reliance on *Flack v. Friends of Queen Catherine Inc.*, 139 F.Supp.2d 526 (S.D.N.Y. 2001), to support its conclusion that "VARA excludes all modifications that occur through the passage of time, even those caused by gross negligence does not persuade. This case is distinguishable from *Flack.*

In *Flack* the court dismissed a VARA claim because the head of a statue was exposed to the elements, causing the clay to deteriorate, but there was no evidence that the Respondent otherwise directly damaged the work. 139 F.Supp.2d at 534–35. In other words, the damage was caused by natural environmental factors. Here, instead, the toxic environment is created by Respondent. Moreover, the situations are distinguishable as in *Flack* there was no intent to destroy the sculpture. Here, as conclusively shown by the record (notwithstanding the district court's finding to the contrary, at A224), the ultimate destruction of the Murals has been the sole rationale for Respondent's action, *i.e.*, first Respondent wanted to paint over the Murals, then to remove them, and, after these alternatives proved not feasible, now Respondent proposes to wall-off the Murals, never to be seen again. The exception is not applicable here. The damage to the Murals will not be caused by the "passage of time" or the "inherent nature of the materials"; it is caused because Respondent will cause the toxic condition by erecting the wall.

This issue was previously addressed in this district in *Cohen v. G & M Realty L.P.*, 320 F.Supp.3d 421 (E.D.N.Y. 2018) *aff'd., Castillo v. G & M Realty L.P.*,

950 F.3d 155 (2d Cir. 2020), *cert. denied*, 141 S.Ct. 363 (2020). There the court noted "[t]he exception is not applicable here. The whitewashing was not caused by the "passage of time" or the "inherent nature of the materials"; it was caused by [defendant] Wolkoff throwing paint on the works."

As in *Cohen*, the passage of time exception does not apply here as Respondent's wall is causing the modification, distortion, or mutilation of Appellant's Murals. Here, it is conceded that over time the wall will cause damage to the Murals. Moreover, any damage cannot be monitored or corrected. Despite this knowledge, Respondent proposes to move ahead and wall off the Murals. As held in *Cohen*, a party that knowingly creates a situation that will cause damage cannot rely on the "passage of time" exception.

### C. There Are Remaining Issues of Material Fact Concerning the Extent of Damage to the Murals Foreclosing Summary Judgement

If, as we submit, the passage of time exception does not apply, then there are clearly issues of material fact as to whether Respondent's wall will distort, mutilate, or modify Appellant's Murals. Appellant's expert opinions in the record, clearly set forth the likely degradation to the Murals, caused by their entombment behind the wall. Respondent has not offered any expert opinions that rebut these conclusions. Accordingly, these expert opinions raise issues of material fact as to

whether the likely damage to the surface of the Murals will cause distortion, mutilation, or other modification of the Murals that is actionable under VARA.

Since the expert opinions directly tie this likely damage to Respondent's act of erecting the wall, the record further supports that such damage was intentional. Respondent is knowingly erecting a wall in disregard of its impact on the Murals. Notwithstanding that it has learned of the harm that is likely to occur it persists in its effort to wall-off the Murals.

Accordingly, there are factual issues that must be resolved that preclude summary judgment.

### III. VARA GRANTS APPELLANT THE RIGHT TO PREVENT THE INTENTIONAL DESTRUCTION OF MURALS WHICH ARE OF RECOGNIZED STATURE

In enacting VARA, Congress created a special category for artwork that achieved "recognized structure" in the artworld.  In 17 U.S.C. § 106A(a)(3)(B) the statute provides that an artist shall have the right:

> to prevent any destruction of a work of recognized statute, and any intentional or grossly negligent destruction of that work is a violation of that right.

And in the legislative history it was further emphasized that,

> While no per se rule exists, modification of a work of recognized stature will generally establish harm to honor or reputation".

House Report, p. 6926.

It is thus apparent that works of such stature deserve particular protection, as was recognized by this Court in *Cohen v. G & M Realty L.P.*, 320 F.Supp.3d 421 (E.D.N.Y. 2018) *aff'd., Castillo v. G & M Realty L.P.*, 950 F.3d 155 (2d Cir. 2020), *cert. denied*, 141 S.Ct. 363 (2020).

Appellant's Murals have achieved recognized stature.  It is conceded by Respondent (A180), so found to by the district court (A223), and documented in the record.  While the district court referenced Appellant's Murals as artwork of recognized stature it dismissed his claim under VARA because it found that under its view, there was no destruction because it determined that destruction "…is not incremental and is frequently sudden and that it is the completeness of the change worked on the object" which defines the term.  However, as with the definition of the term modification, the district court failed to consider the term in the context of the statute and, more importantly, completely ignores the right given to the artist "to prevent" such destruction.

The issue before the district court was not whether the Murals were destroyed as it defined it, but whether Appellant has a claim that Respondent's intentional erection of the wall may result in the Murals' destruction which he now seeks to prevent.  The record before this Court establishes that damage could be so great as to "destroy" the Murals.  The experts' concerns relate specifically to the damage to the surface of the Murals resulting from the chemicals off-gassing from the panels,

and mold and surface degradation resulting from changing humidity and lack of ventilation. Appellant's experts establish harm will occur. Respondent has no rebuttal. While the extent of the harm, as of yet, is not defined, Appellant need not wait for the ultimate harm to result in destruction in order to prevent it.

There is no clear definition of destruction as compared to the other terms of damage referenced in the statute. In its discussion of 17 U.S.C. § 106A(a)(3)(B), the district court emphasizes that destruction of a work of art "is defined as 'to tear down or break up'" (A223-A224, *citing, Bd. Of Managers of Soho Int'l. Arts Condo v. City of New York*, No. 01 Civ. 1226 (DAB), 2005 WL 1153752, at *3 (S.D.N.Y. May 13, 2005)). What the district court omits in its reliance on *Soho* is that the instances of "destruction" that occurred in *Soho*, is the repainting and removal of brackets attached to a building. Regarding the repainting, *Soho* explains that were Thomas Gainsborough's *The Blue Boy* repainted with red clothing, this would destroy the painting. *Id*, at fn. 7. Thus, *Soho* suggests that there are gradations of "destruction".

As recognized by the district court, Appellant's experts predict deterioration of the Murals due to the toxic environment created by the wall. While the ultimate extent of this damage is unclear, it appears more likely than not, that it will cause sufficient damage to the Murals that for all practical purposes they are destroyed. Certainly, it cannot be said at this stage of the proceeding in this case that as a

matter of law destruction of the Murals will not occur.  For purposes of summary judgement, the district court must accept that the wall will cause damage to the Murals. The extent of such damage which Appellant seeks to prevent is an issue for the trier of fact to determine at trial and cannot be dismissed on the record before this court.

In addition, a wall permanently blocking the Murals can, in and of itself, be deemed to be a destruction under the statute.  The original Mural is now gone.  It has not been moved or stored in some accessible location.  It has been made permanently unviewable by the construction of a structure solely intended to remove it from existence. Respondent's goal has always been the destruction of the Murals as evidenced by the affidavits filed in opposition to the motion for preliminary injunction and in response to the district court's request for additional information.   Respondent's first effort was to paint over the Murals; when it learned that VARA prohibited it from doing so it then demanded that Appellant remove them; when that failed under the statute it proposed to affix panels to the Murals to be rid of them.  When that too was not feasible it then decided to erect the wall to make it inaccessible and thereby accomplish its ultimate goal of the destruction of the Murals. By blocking the Murals from view and making it inaccessible, for all intents and purposes, under the terms of VARA they have destroyed an artwork of a recognized stature.

## <u>CONCLUSION</u>

For the reasons set forth above, the Order and Final Judgment of the district court granting summary judgment and dismissing Appellant's claims under VARA should be reversed.

Dated:      March 3, 2022
              New York, New York

                          Respectfully submitted,
                          **MCLAUGHLIN & STERN, LLP**

By:    <u>/s/ Steven J. Hyman</u>
        Steven J. Hyman
        Oliver R. Chernin
        260 Madison Avenue
        New York, New York 10016
        212 448-1100

            *and*

        Richard I Rubin
        Rubin, Kidney, Myer & Vincent
        237 N. Main St., Ste. 3
        Barre, Vermont 05641
        802-461-4177

        *Attorneys for Plaintiff-Appellant*
        *Samuel Kerson*

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

I hereby certify that:

1.　　This document complies with the word limit of Fed. R. App. P. Local Rule 32.1(a)(4)(A) because, excluding those parts of this document exempted by Fed. R. App. P. 32(f), this document contains 10731 words.

2.　　This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type-style requirements of Fed. R. App. P. 32(a)(6), because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font size in Times New Roman.

Dated:　　　March 3, 2022
　　　　　　 New York, New York

　　　　　　　　　/s/ Oliver R. Chernin
　　　　　　　　　Oliver R. Chernin
　　　　　　　　　*Attorney for Plaintiff-Appellant*
　　　　　　　　　*Samuel Kerson*

46