# No. 21-2904

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

**SAMUEL KERSON**

**Plaintiff-Appellant**

**v.**

**VERMONT LAW SCHOOL, INC.,**

**Defendant-Appellee**

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF VERMONT
No. 5:20-cv-00202 (Hon. Geoffrey Crawford)**

**BRIEF OF APPELLEE VERMONT LAW SCHOOL, INC.**

Justin B. Barnard, Esquire
Karen McAndrew, Esquire
DINSE, P.C.
209 Battery Street
Burlington, VT 05401
(802) 864-5751
ATTORNEYS FOR APPELLEE

June 3, 2022

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Appellee Vermont Law School, Inc. makes the following corporate disclosure pursuant to Fed. R. App. P. 26.1(a):

Vermont Law School, Inc. has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT .................................... i

TABLE OF AUTHORITIES ................................................. iv

STATEMENT OF THE ISSUES PRESENTED ................................1

STATEMENT OF THE CASE ...............................................2

    A.    The Visual Artists Rights Act ...................................2

    B.    The Kerson Mural ..............................................5

    C.    The Cover ......................................................7

    D.    The District Court's Decisions ................................11

SUMMARY OF THE ARGUMENT .........................................13

ARGUMENT ............................................................14

I.    COVERING A WORK OF ART TO REMOVE IT FROM
DISPLAY IS NOT A "MODIFICATION" OR ACT OF
"DESTRUCTION" ACTIONABLE UNDER VARA ...........................14

    A.    The Plain Language of VARA Does Not Prohibit Covering a
Work .........................................................14

    B.    The Public Presentation Exception Reflects Congress's
Intent to Exclude from VARA Decisions on Whether to
Display a Work ...............................................21

    C.    The District Court's Interpretation of VARA Is Consistent
with the Pertinent Case Law ..................................26

II.    THE POTENTIAL RISK OF DETERIORATION OVER TIME
DUE TO ENVIRONMENTAL CONDITIONS DOES NOT
PRESENT A COGNIZABLE VIOLATION OF VARA ......................29

    A.    VARA's Express Exception for Changes Occurring Over
Time Bars Kerson's Theory of Liability Due to
Deterioration ................................................30

    B.    Even Absent the "Passage of Time" Exception, the Risk of
Deterioration to the Mural Would Not Make Out a
Violation of VARA ...........................................33

**III. AS CONSTRUING VARA TO PROHIBIT A PRIVATE PARTY FROM DISCONTINUING DISPLAY OF A MURAL WOULD PRESENT GRAVE FIRST AMENDMENT CONCERNS, THE CANON OF CONSTITUTIONAL AVOIDANCE FAVORS AFFIRMANCE** ....................................................................37

**CONCLUSION**.................................................................................41

**CERTIFICATE OF COMPLIANCE** ...............................................43

# TABLE OF AUTHORITIES

**Cases**

*American Legion v. American Humanist Association*,
   139 S. Ct. 2067 (2019)..........................................................................40
*Burns v. Martuscello*, 890 F.3d 77 (2d Cir. 2018).............................. 39, 40
*Carroll v. Blinken*, 957 F.2d 991 (2d Cir. 1992) .......................................40
*Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77 (2d Cir. 1995) ....................2, 3
*Castillo v. G&M Realty L.P.*, 950 F.3d 155 (2d Cir. 2020)......................33
*Clark v. Martinez*, 543 U.S. 371 (2005) ..................................................38
*Cohen v. G&M Realty L.P.*, 320 F. Supp. 3d 421 (E.D.N.Y. 2018)........33
*Curley v. AMR Corp.*, 153 F.3d 5 (2d Cir. 1998) ....................................35
*Duncan v. Walker*, 533 U.S. 167 (2001)...................................................37
*English v. BFC Partners*, 198 F.3d 233 (2d Cir. 1999).................... 27, 28
*English v. BFC&R East 11th St. LLC*,
   No. 97 CIV. 7446 (HB), 1997 WL 746444 (S.D.N.Y. Dec. 3, 1997).......... 27, 28
*Flack v. Friends of Queen Catherine Inc.*,
   139 F. Supp. 2d 526 (S.D.N.Y. 2001) ..................................... 31, 32, 36
*Greenery Rehab. Group, Inc. v. Hammon*, 150 F.3d 226 (2d Cir. 1998)...............16
*Jackler v. Byrne*, 658 F.3d 225 (2d Cir. 2011) ........................................39
*Kelley v. Chicago Park Dist.*, 635 F.3d 290 (7th Cir. 2011) ...................21
*LeVeille v. Upchurch*, No. 3:19-CV-908-J-39MCR, 2020 WL 10180570
   (M.D. Fla. Aug. 3, 2020)...................................................................18
*Lewis v. Black Rose Tavern, Inc.*, No. CV-15-7860, 2015 WL 13907455
   (C.D. Cal. Nov. 18, 2015) .................................................................18
*Massachusetts Museum of Contemporary Art Foundation, Inc. v. Buchel*,
   593 F.3d 38 (1st Cir. 2010) ................................................... 25, 26, 27
*MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*,
   512 U.S. 218 (1994) ..........................................................................16
*Natural Resources Defense Council, Inc. v. Muszynski*,
   268 F.3d 91 (2d Cir. 2001) ...............................................................19
*Phillips v. Pembroke Real Estate, Inc.*, 459 F.3d 128 (1st Cir. 2006)............. 24, 25
*Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009) ................38
*Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214 (1985).......................38
*Riley v. National Federation of the Blind,* 487 U.S. 781 (1988) ............39
*Solid Waste Agency of Northern Cook County v. U.S. Army Corps of
   Engineers*, 531 U.S. 159 (2001) .......................................................38
*Tobin v. The Rector*,
   No. 17 CIV. 2622 (LGS), 2017 WL 5466705 (S.D.N.Y. Nov. 14, 2017)..........36

iv

*United States v. Bedi*, 15 F.4th 222 (2d Cir. 2021)..................................15
*United States v. Dauray*, 215 F.3d 257 (2d Cir. 2000)............................14
*United States v. Jones*, 965 F.3d 190 (2d Cir. 2020)........................ 14, 15
*United States v. Martinez*, 525 F.3d 211 (2d Cir. 2008)..........................38
*United States v. Venturella*, 391 F.3d 120 (2d Cir. 2004).......................26
*Washington State Department of Social & Health Services v.*
  *Guardianship Estate of Keffeler*, 537 U.S. 371 (2003)......................17
*Wooley v. Maynard*, 430 U.S. 705 (1977) ....................................... 39, 40

## Statutes

17 U.S.C. § 101 ..........................................................................................3
17 U.S.C. § 106A .............................................................................. passim
17 U.S.C. § 113 ................................................................................ 4, 25, 26

## Other Authorities

American Heritage Dictionary of the English Language (4th ed. 2000)................15
H.R. Rep. No. 101-514, 101st Cong., 2d Sess. (1990), *reprinted in* 1990
  U.S.C.C.A.N. 6915 ...................................................................... passim
Berne Convention for the Protection of Literary and Artistic Works, July
  14, 1967, 11850 U.N.T.S. 828...................................................................21
Sawyer Loftus & Elizabeth Hewitt, *Police Investigate Vandalism of Black
  Lives Matter Mural*, VTDigger (June 14, 2020)...................................35
Merriam Webster Dictionary .........................................................................15, 16
Cheryl Swack, *Safeguarding Artistic Creation and the Cultural Heritage:
  A Comparison of Droit Moral Between France and the United States*,
  22 Colum. VLA J.L. & Arts 361 (1998) .............................................21
Aidan Quigley, *Controversial Burlington Mural Vandalized Again*,
  VTDigger (Nov. 2, 2018)...................................................................35

## <u>STATEMENT OF THE ISSUES PRESENTED</u>

1.  Did the District Court properly grant summary judgment to Vermont Law School, given that the plain language of the Visual Artists Rights Act cannot be read to prohibit a private institution from covering a mural that it wishes to remove from display on its own property?

2.  Did the District Court properly conclude that the risk of a work of art deteriorating over time due to environmental conditions is not actionable under the Visual Artists Rights Act?

3.  If Appellant's construction of the Visual Artists Rights Act were even plausible, would the canon of constitutional avoidance counsel affirmance of the District Court's judgment to avoid the grave First Amendment concerns raised by compelling a private institution to continue displaying a work of art against its will?

## STATEMENT OF THE CASE

Appellant Samuel Kerson ("Kerson") filed this action in the United States District Court for the District of Vermont on November 30, 2020, seeking to enjoin Vermont Law School, Inc. ("VLS"), a private educational institution located in South Royalton, Vermont, from covering over and removing from display a mural painted by Kerson in a VLS building.  After a preliminary hearing in February 2021, the District Court (Hon. Geoffrey Crawford) denied Kerson a preliminary injunction and converted a pending motion to dismiss by VLS to a motion for summary judgment.  The District Court subsequently granted summary judgment to VLS in an October 20, 2021 Order, entering judgment on November 5, 2021. Kerson filed a timely Notice of Appeal on November 23, 2021.

A summary of the statutory framework and facts pertinent to this appeal follows.

### A.    The Visual Artists Rights Act

The Visual Artists Rights Act ("VARA"), enacted by Congress in 1990, functions to protect two aspects of the "moral rights"[1] of visual artists in works they create: the rights of attribution and of integrity.  *See* 17 U.S.C. § 106A(a).

---

[1] The concept of moral rights, which originated in civil law, "is meant to capture those rights of a spiritual, non-economic and personal nature," arising "from a belief that an artist in the process of creation injects his spirit into the work and that the artist's personality, as well as the integrity of the work, should therefore be protected and preserved."  *Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 81 (2d Cir. 1995).

The right of attribution "generally consists of the right of an artist to be recognized by name as the author of his work or to publish anonymously or pseudonymously, the right to prevent the author's work from being attributed to someone else, and to prevent the use of the author's name on works created by others, including distorted editions of the author's original work." *Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 81 (2d Cir. 1995). The right of integrity—which is what is at issue in the present appeal—"allows the author to prevent any deforming or mutilating changes to his work, even after title in the work has been transferred." *Id.*

VARA provides, in relevant part, that the author of a "work of visual art"—defined to include a painting, drawing, print, sculpture, or still photographic image, *see* 17 U.S.C. § 101—shall have the right, subject to certain exceptions:

> (A) to prevent any intentional distortion, mutilation, or other modification of that work which would be prejudicial to his or her honor or reputation, and any intentional distortion, mutilation, or modification of that work is a violation of that right, and

> (B) to prevent any destruction of a work of recognized stature, and any intentional or grossly negligent destruction of that work is a violation of that right.

*Id.* § 106A(a)(3). Stated simply, VARA creates two categories of protection for the integrity of works of visual art: all works are protected against intentional distortion, mutilation, or modification prejudicial to the artist's reputation or honor, but only works of "recognized stature" are protected against destruction. These

rights are personal to the author of the work, and terminate upon the death of the author. *Id.* § 106A(b), (d).

VARA sets forth two primary exceptions. First, the Act clarifies that modifications to a work that are "a result of the passage of time or the inherent nature of the materials" are not actionable. *Id.* § 106A(c)(1). Second, the Act generally bars claims arising from the public presentation of a work. *See id.* § 106A(c)(2) (the "modification of a work of visual art which is the result . . . of the public presentation, including lighting and placement, of the work is not a destruction, distortion, mutilation, or other modification described in subsection (a)(3) unless the modification is caused by gross negligence").

VARA also establishes special rules for the removal of works of art that are incorporated into a building (such as a mural), the application of which turns on whether and how removal will impact the work. If removal will result in the "destruction, distortion, mutilation, or other modification of the work," the work generally may be removed only pursuant to a written instrument signed by its author and the building owner. *Id.* § 113(d)(1). Works capable of removal without destruction or mutilation, on the other hand, may be removed if the building owner provided the author with written notice of the intended action and "the person so notified failed, within 90 days after receiving such notice, either to remove the work or to pay for its removal." *Id.* § 113(d)(2).

**B.     The Kerson Mural**

For almost thirty years, the mural at issue in this appeal, "The Underground Railroad, Vermont and the Fugitive Slave" (the "Mural"), occupied a central location on the campus of VLS: the loft of the Chase Community Center, a space widely used for study as well as school gatherings and events.  (A20, A61, A80.) The Mural was well-intentioned, meant to depict and serve as a reminder of the United States' dark history of slavery as well as to celebrate Vermont's role in the Underground Railroad.  (A62, A72.)  However, as even the Mural's author, Samuel Kerson, has acknowledged, the Mural has been controversial from the time it was completed, and there have been many complaints about the manner in which it depicts its subject matter.  (A61-63, A68.)

Chief among the concerns that have been articulated is the way in which Africans and African-Americans were painted.  Observers have noted the "cartoonish, almost animalistic style" of depicting Black figures, with "large lips, startled eyes, big hips and muscles."  (A62, A67.)  For some, these features evoke "'Sambos' or other racist coon caricatures."[2]  (A67.)  The Mural's depiction of white figures has also been identified as problematic: Kerson painted white slavers in unnatural green hues, "disassociat[ing] the white bodies from the actual

---

[2] These complaints are apparently lost on Kerson.  When asked about his exaggerated depiction of African bodies, he responded, "well, that's the way Africans look." (A68.)

5

atrocities that occurred," whereas he depicted abolitionists in white tones,

"perpetuat[ing] white supremacy, superiority, and the white savior complex."

(A67, A73.)

For these reasons, students—particularly those of color—have expressed

their discomfort with the Mural for years, to the point that some have avoided

using the study space adjacent to the Mural. (A61-63, A80.) As early as 2013, the

prospect of permanently removing the Mural was raised in discussions with VLS's

Diversity Committee, but at the time it was felt there was insufficient support to

press the matter further. (A62.) The issue came to a head with the 2020 murder of

George Floyd in Minneapolis and the more widespread national discussion of

institutional racism that followed. (A63-64, A68-69, A80-81.) As a result, VLS's

Associate Dean for Student Affairs and Diversity approached the President and

Dean of VLS to request that the Mural be removed. (A64.) At the same time, and

independently, a broad group of students, alumni, faculty, and staff also presented

a formal demand for the Mural's removal. (A64, A68-69.)

Resolving to address these concerns, VLS initially contemplated painting

over the Mural—unaware, at that time, of VARA and its potential bearing on

handling of the Mural. (A64.) Once alerted to VARA, VLS instead issued a letter

to Kerson advising that, unless he arranged to remove the Mural within ninety

days, VLS intended to proceed with removal or covering of the Mural. (A42,

A64.)  In response, Kerson arranged for carpenters to visit, with VLS's permission, and evaluate the feasibility of removing the work.  (A12, A53.)  The carpenters concluded that, because the Mural was painted directly onto the drywall forming the walls of Chase Hall, the Mural could not "be removed without inflicting significant damage that would prohibit [it from] ever being remounted in another location."  (A56-59.)  Accordingly, VLS decided to proceed with a compromise solution: installing a permanent cover over the Mural.  (A64.)

### C.    The Cover

In evaluating options for permanently covering the Mural, VLS's objective was to develop and implement a design that would not harm the artwork as the cover was being installed.  (A82, A141.)  The design on which VLS settled utilizes acoustic panels constructed of a light-weight frame housing sound-dampening material, covered in a cushioning fabric.  (A83, A86.)  The acoustic panels are mounted on a wooden frame affixed to the wall surrounding the Mural (but not touching the Mural itself), designed to suspend the panels approximately two inches away from the painted surface of the wall and prevent the panels from deflecting into the artwork.[3]  (A90-94.)  As VLS has conceded, it did not consult with an art conservator in designing the cover; its driving concern was not

---

[3] Sketches of the frame design are located in the Appendix at A92-94.

7

complying with formal art conservation standards, but simply covering the Mural without harming it in the process.  (A179.)

In the litigation below, Kerson introduced no evidence that the design and installation of the cover would cause direct, immediate injury to the Mural.[4] Rather, his primary objection was that the act of removing the Mural from display, in and of itself, would harm his reputation.  Kerson contended that covering the Mural "will send the clear message to the art world and general public that the [Mural is] offensive and unworthy to be viewed."  (A25.)  He elaborated that, in his view, "[n]ot only will this denigrate the value of the work itself, it will also undoubtedly tarnish my reputation as an artist committed to progressive causes." (*Id.*)

Kerson also offered opinion evidence from an art conservator, Emily Phillips, that the cover would not "be consistent with best practices in the art conservation field" and for that reason posed an undefined risk of deterioration of the Mural over time.[5]  (A146, A149.)  Phillips' opinion—which the District Court

---

[4] Kerson's art conservation witness expressly declined to offer an opinion on whether the installation of the cover would cause immediate harm to the Mural. (A159-60.)

[5] Appellant's brief also refers to the supposed opinion of a "renowned expert," Harriet Irgang Alden, that the "acoustic panels contained material that could create an acidic atmosphere."  *See* Appellant's Br. at 11.  While not material, this is a mischaracterization of the record.  The document Appellant cites is an email from Alden suggesting that, since the acoustic panels were not typically used in the

described at hearing as "pretty close to ipse dixit" (A200)—identified three areas of supposed concern.

The first was the use of the acoustic panels, which were, according to Phillips, a "completely unknown material" and thus might contain substances that "may adversely impact . . . the murals." (A147.) Phillips also expressed concern as to whether the panels were permeable and would allow for proper air flow. (*Id.*) However, Phillips acknowledged at deposition that she had never actually examined or tested the panels, and thus she did not know whether the panel materials would off-gas, what gases would be produced if so, how the gases would impact the Mural, and how permeable the panels were to airflow. (A160-61, A164, A170.)

Second, Phillips suggested that the space that would be created between the cover and the Mural might subject the artwork to "[w]ide temperature variances" and "high humidity" over time, leading to water condensation and biological growth or mold. (A147.) Phillips attributed this risk in part to the fact that the Mural is painted on an exterior wall, which can increase the risk of moisture infiltration. (A165.) Phillips testified that the likelihood of moisture infiltration

conservation of artwork, "there needs to be a review of what impact they would have," the primary concern being "any off-gassing fumes from adhesives used in their manufacture." (A126.) Alden did not say she was in fact familiar with the panels or had an opinion on the actual materials used in their manufacture. Moreover, Alden did not offer any sworn testimony or opinions in this case, and, in fact, declined to serve as an expert. (A124.)

will depend on construction of the building and the permeability of the cover, and she acknowledged that she had no information on how the exterior walls of Chase Hall were constructed or the permeability of the acoustic panels, making it difficult to predict what changes may in fact take place in the space underneath the cover. (A164-65.)

Third, Phillips expressed concern that, in blocking the Mural from view, the cover will prevent visual monitoring of any changes in or deterioration of the Mural. (A148.) However, she acknowledged that VLS had proposed installing temperature and humidity meters behind the cover to allow conditions to be monitored, and that the installation of such meters would provide useful information on the risk of damage due to temperature fluctuations and moisture infiltration. (A116-17, A169.)

Notwithstanding the lack of concrete supporting detail, Phillips concluded that it was more likely than not that some deterioration would eventually occur to the Mural if covered. (A170-71.) Beyond this summary opinion, however, she was unable to provide a percentage to quantify the risk of damage; she could not predict when (if at all) the damage would occur; she could not say what mechanism would cause the damage; and she could not say how extensive the damage might be. (*Id.*) In other words, the risk of damage was entirely hypothetical. As the District Court summarized it, Phillips' opinions boiled down

10

to: "Something's wrong here [ . . . ;] I don't know what it is, but I think, more likely than not, this is going to end badly."  (A200.)

### D.    The District Court's Decisions

The District Court addressed the merits of Kerson's VARA claim in two separate decisions.  In the first of these—the District Court's March 10, 2021 Order denying Kerson a preliminary injunction restraining the covering of the Mural—the Court concluded that Kerson had failed to carry his burden of establishing a likelihood of success on the merits of his claim that covering the Mural would violate VARA.  Looking to the text of the statute, the Court reasoned that concealment of a work of art does not fall within the plain meaning of VARA's prohibitions on "modification" or "destruction":

> Both "modify" and "destroy" are words in common usage with distinct meanings. Modify means to alter or change an object. It does not mean to conceal it from view. Concealment may be a consequence of modification—as when camouflage is applied to a vehicle—but it is an act separate from modification. We might tell a child to hide as part of a game, but we would not tell her to modify herself from view. . . . [¶] Destroy is an easier word to define in the context of the VARA. It means to damage in an irreparable fashion as in burning, tearing or discarding an artwork. It does not mean to remove from display . . . .

(A110-11.)  The Court thus held that Kerson was "unlikely to obtain a final judgment from this court enjoining the construction of the wall of acoustic panels

11

because the language of . . . VARA does not include a protection against concealment or removal from display of artworks by the owner."[6]  (A112.)

The District Court subsequently granted summary judgment for VLS on October 20, 2021.  In its Order, the Court once again held that concealment of a work was not a "modification" under VARA; it noted that this conclusion was supported by the exceptions to VARA, which clarify that "[d]ecisions about display and conservation, essentially the handling of the artwork by its owner through the years following acquisition, are not 'modifications' that give rise to rights under . . . VARA."  (A220.)  Addressing the evidence from Emily Phillips that deterioration was likely to occur due to environmental conditions, the District Court held that such "changes that they fear may occur over time" were explicitly excluded from VARA's scope by 17 U.S.C. § 106A(c)(1).  (A222.)  The Court also concluded that risk of deterioration over time was "fairly categorized as concerns of modification or partial damage" and did not constitute the type of "obliteration and total loss" that would qualify as "destruction" of the work under VARA. (A225.)  Accordingly, the District Court held that the installation of a permanent cover over the Mural would not implicate any rights protected by VARA.

---

[6] The Court also noted that there was a second aspect to the question, "whether, as a matter of art conservancy, placing the murals behind the acoustic panels will cause the work to deteriorate," but concluded that there was no evidence in the record on the preliminary injunction motion that placement of the Mural behind panels would cause deterioration.  (A110.)

## SUMMARY OF THE ARGUMENT

The question at the heart of this appeal is straightforward: does federal law compel a private institution to continue to display a work of art where the institution wishes to cover and remove it from display? The answer must be no. The plain language of VARA prohibits only the modification or, in certain cases, destruction of a work of art, neither of which is implicated by the decision to place a cover over artwork. Indeed, Congress specifically exempted from VARA decisions regarding the presentation of a work of art—including, necessarily, the decision not to display a work.

Nor does VARA authorize a cause of action based upon the risk that covering a work might generate environmental conditions that could eventually lead to deterioration. Simply put, VARA is not an art preservation statute. It grants limited, narrowly defined protections for an artist's rights of attribution and integrity during the artist's lifetime—and it expressly disclaims any cause of action based on changes caused by the passage of time and nature of materials used in the art. Private owners make countless decisions that could impact the preservation of works of art over time, from hanging a painting in a sunny room to storing art in an uninsulated attic space. Nothing in the language or structure of VARA suggests that Congress intended to impose liability on private parties for such decisions.

13

At stake here is not just the fate of a painting; this appeal also places core constitutional values in the balance. Kerson's construction of VARA, if credited, would directly infringe upon the First Amendment rights of private individuals and entities. The First Amendment protects not only the affirmative right of expression, but also the choice not to speak—and yet, under Kerson's reading of the law, property owners hosting a work of art incorporated into a building would be legally compelled to continue to display the work during the artist's lifetime, no matter whether it was consistent with the values and message they wished to communicate to their community and the outside world. The canon of constitutional avoidance favors a construction of VARA that will not directly run afoul of First Amendment limitations on compelled speech. As the District Court's reading of VARA is consistent with its plain text and avoids a serious constitutional infirmity, the Court should affirm.

## **ARGUMENT**

## I. COVERING A WORK OF ART TO REMOVE IT FROM DISPLAY IS NOT A "MODIFICATION" OR ACT OF "DESTRUCTION" ACTIONABLE UNDER VARA.

### A. The Plain Language of VARA Does Not Prohibit Covering a Work.

The "starting point in statutory interpretation is the statute's plain meaning, if it has one." *United States v. Jones*, 965 F.3d 190, 194 (2d Cir. 2020) (quoting *United States v. Dauray*, 215 F.3d 257, 260 (2d Cir. 2000)). Where the statute is

14

plain and unambiguous, the court's "sole function is to enforce it according to its terms." *United States v. Bedi*, 15 F.4th 222, 226 (2d Cir. 2021) (citation and quotation marks omitted). Here, the "case begins, and pretty much ends, with the text" of VARA. *Jones*, 965 F.3d at 194 (citation and quotation marks omitted). Under any plausible construction of the statute, removing a work of art from display by covering falls outside the scope of VARA's proscriptions.

As pertinent here, VARA prohibits only two actions: (a) the "destruction of a work of recognized stature"[7] and (b) "any intentional distortion, mutilation, or other modification" of a work of visual art "which would be prejudicial to [the artist's] honor or reputation." 17 U.S.C. § 106A(a)(3). With regard to the first, the act of covering a work of art is plainly not an act of destruction, provided that it leaves the work intact. *See, e.g.*, Destroy, Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/destroy ("to put out of existence"); Destroy, American Heritage Dictionary of the English Language (4th ed. 2000) ("to tear down or break up"). The act of pulling down a shade to cover a window may block one's view, but certainly nobody would characterize it as "destroying"

---

[7] Appellant represents that VLS has "conceded" that the Mural is a work of recognized stature, *see* Appellant's Br. at 7, but that is not correct. As noted in the portion of the hearing transcript Appellant cites, VLS did not contest the issue for purposes of summary judgment, but made clear that VLS was "not conceding for purposes of this lawsuit that the work is a work of recognized stature." (A180.)

15

either the window or the view. So too the installation of a cover over the Mural does not in any way "destroy" it.

Nor can covering a work of visual art to remove it from view be said to "distort," "mutilate," or "modify" the work in a manner prejudicial to the artist's honor or reputation. These terms are commonplace and, "unless otherwise defined, individual statutory words are assumed to carry their ordinary, contemporary, common meaning." *Greenery Rehab. Group, Inc. v. Hammon*, 150 F.3d 226, 231 (2d Cir. 1998) (citation omitted). The ordinary meaning of "distort" is to "twist" or "alter to give a false or unnatural picture or account,"[8] and to "mutilate" means to "cut up or alter radically so as to make imperfect."[9] Plainly, installing a cover over a work is neither a distortion nor a mutilation.

"Modify," while a more general term, likewise signifies an incremental change that alters some portion of an object while not replacing or transforming the whole. As the Supreme Court observed in *MCI Telecommunications Corp. v. American Telephone & Telegraph Co.*, 512 U.S. 218 (1994):

> The word "modify"—like a number of other English words
> employing the root "mod-" (deriving from the Latin word for
> "measure"), such as "moderate," "modulate," "modest," and
> "modicum"—has a connotation of increment or limitation. Virtually

---

[8] Distort, Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/distort.

[9] Mutilate, Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/mutilate.

> every dictionary we are aware of says that "to modify" means to change moderately or in minor fashion.

*Id.* at 225 (collecting dictionary definitions). Here, "modify" is further narrowed by the context in which it appears, as the third and final catchall term in a list of types of potentially actionable changes to a work of visual art. *See* 17 U.S.C. § 106A(a)(3)(A) (applying to "intentional distortion, mutilation, *or other modification* of [a] work" (emphasis added)). The principles of *ejusdem generis* and *noscitur a sociis* require reading "other modification" in this context to mean a change similar to a "distortion" or "mutilation." *See Wash. State Dep't of Soc. & Health Servs. v. Guardianship Est. of Keffeler*, 537 U.S. 371, 384 (2003) ("[U]nder the established interpretative canons of noscitur a sociis and ejusdem generis, where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." (quotation marks, alterations, and citations omitted)).

In short, each of the terms in § 106A(a)(3)(A), in context, naturally connotes a physical change in a work or a change in how a work of visual art is perceived—which is precisely how courts have applied the statute. For example, a recent decision recognized a modification potentially actionable under VARA where the defendant shot an artist's paintings with multiple rounds from a shotgun and rifle, and subsequently signed his own name to the paintings and wrote a derogatory

17

message on one.  *See LeVeille v. Upchurch*, No. 3:19-CV-908-J-39MCR, 2020 WL 10180570, at *1 (M.D. Fla. Aug. 3, 2020).  In another, a court found a potentially meritorious claim where the defendant dismantled a mural into six segments and offered them for sale as individual pieces, despite the fact that a single quotation ran across the segments (and thus the separation of the component pieces would destroy or alter the work's meaning).  *See Lewis v. Black Rose Tavern, Inc.*, No. CV-15-7860, 2015 WL 13907455, at *5 (C.D. Cal. Nov. 18, 2015).

In contrast, when one wholly removes a work of art from view, whether by covering it or moving it into storage, the work itself has not been "modified" within the ordinary meaning of the term.  As the District Court observed, "no conventional use of the word [modify] includes 'concealment' as a synonym." (A220.)  If you walk past a painting on your way to work every day, and one day you notice that the painting has been removed or covered and is no longer on display, you would not tell your coworkers that the painting had been "modified" or "distorted"—you would say it was gone or concealed.  Inherent in the statute's terms is the presumption that some portion of the original work remains visible in an altered form, such that there is something that can be said to have been modified, mutilated, or distorted in a manner that risks prejudice to the integrity of the artist.

18

Kerson advances two arguments to the contrary, neither of which has merit. First, Kerson contends that "modification" is ambiguous in the context of the statute, citing VARA's presentation exception as confirmation that the term "is not limited to physical changes of the artwork itself, but rather includes changes in how the artwork is presented."  Appellant's Br. at 24.  But even if this were so, there is nothing in the statute—and Kerson points to nothing—that suggests "modification" could plausibly be interpreted to extend beyond "changes in how the artwork *is presented*" to encompass the decision *not* to present a work of art.  A statute is only ambiguous if "susceptible to two or more reasonable meanings," *Natural Res. Def. Council, Inc. v. Muszynski*, 268 F.3d 91, 98 (2d Cir. 2001), and the construction Kerson advocates—that "modification" of a work includes the choice to discontinue display of the work—is simply not a reasonable alternative interpretation of the term.

Second, Kerson suggests that the District Court erred in focusing only on whether covering the Mural constituted a distortion, mutilation, or modification "and not on how that action would impact . . . Appellant's honor and reputation in the artwork."  Appellant's Br. at 25.  This argument misapprehends the interplay between the components of the statutory text.  It is true that a viable claim under § 106A(a)(3)(A) requires both a modification of a work *and* prejudice to the artist's reputation or honor flowing from such modification.  But, as the legislative

19

history quoted by Kerson makes clear, the requirement of prejudice functions simply to limit the types of modifications that may be actionable: "Modifications are prohibited *only if they would be prejudicial to the author's honor or reputation*[.]" Appellant's Br. at 25 (quoting H.R. Rep. No. 101-514, 101st Cong., 2d Sess. (1990), *reprinted in* 1990 U.S.C.C.A.N. 6915, 6924-25) (emphasis added). If there is no modification within the meaning of the statute, there is no need to reach the question of whether the supposed modification caused prejudice—hence it was entirely appropriate for the District Court to dispose of the claim solely on the ground that covering the Mural could not be construed as a distortion, mutilation, or other modification of the work.[10]

To the extent Kerson contends that an action or statement that causes prejudice to an artist's reputation may be actionable independent of a concrete modification to the artist's work, he is clearly incorrect—and, indeed, such an interpretation would vastly expand VARA's scope with no justification in the statutory text. The notion is not an entirely fanciful one, for the Berne Convention and some of its member countries recognize a broader slate of moral rights that protect artists' reputations from derogatory actions relating to their works more

---

[10] Even if the District Court had reached the issue, as a matter of logic there could be no prejudice: where a piece of art is removed from view, there is nothing left that could be said to be modified or distorted such that it prejudices the artist's honor or reputation.

generally.[11]  The United States, however, adopted in VARA a much narrower formulation of moral rights that protects an artist's reputation only from prejudice that flows from a specific change to the artist's work.  *See* 17 U.S.C. § 106A(a)(3)(A); *see also Kelley v. Chicago Park Dist.*, 635 F.3d 290, 297-98 (7th Cir. 2011) (discussing the "unease with European moral-rights doctrine" in the United States and observing that, as a result, VARA "is quite a bit narrower than its European counterpart").  Accordingly, where there is no change to the work itself, an artist has no claim cognizable under VARA for prejudice to his or her reputation.

### B.  The Public Presentation Exception Reflects Congress's Intent to Exclude from VARA Decisions on Whether to Display a Work.

Buttressing this plain language construction of VARA is the fact that Congress expressly excluded decisions regarding presentation of a work of art

---

[11] *See, e.g.*, Berne Convention for the Protection of Literary and Artistic Works, art. *6bis*, July 14, 1967, 11850 U.N.T.S. 828, 235 (protecting artists from "any distortion, mutilation or other modification of, *or other derogatory action in relation to*, the said work, which would be prejudicial to his honor or reputation" (emphasis added)); Cheryl Swack, *Safeguarding Artistic Creation and the Cultural Heritage: A Comparison of Droit Moral Between France and the United States*, 22 Colum. VLA J.L. & Arts 361, 379 (1998) (discussing protections against "excessive criticism" of artists under French law).

from the scope of the statute.  The text of the so-called "presentation exception" to VARA states in its entirety:

> The modification of a work of visual art which is the result of conservation, or of the public presentation, including lighting and placement, of the work is not a destruction, distortion, mutilation, or other modification described in subsection (a)(3) unless the modification is caused by gross negligence.

17 U.S.C. § 106A(c)(2).  The legislative history confirms that this exception was intended to cover not only choices in how to display a work, but also the decision to remove it from display.  The House Report on VARA explained that "[g]enerally, the removal of a work from a specific location comes within the exclusion because the location is a matter of presentation, unless the work cannot be removed without causing the kinds of modifications described in proposed subsection 106A(a)(3)."  H.R. Rep. No. 101-514, 101st Cong., 2d Sess. (1990), *reprinted in* 1990 U.S.C.C.A.N. 6915, 6927.  The legislative history does not directly address the decision to cover a work; however, allowing a work to be covered is consistent with the manifest goal of the presentation exception: reserving to the work's owner the right to make decisions as to how—and whether—to display a work.

Kerson's suggestion that the presentation exception is limited to display of works by "museums and galleries," Appellant's Br. at 33, is pure nonsense.  Kerson cites in support only a cherry-picked excerpt from the House Report on

VARA affirming that, under the presentation exception, museums and galleries

would continue to have discretion to "light, frame, and place works of art." *Id*. In

context, it is clear that this stray reference was not intended to confine the

exception to those two institutions:

> Proposed section 106A(c) takes into account current practices of the
> artistic community and supplements the exclusions set forth in the
> definition of a work of visual art. . . . [S]ubsection (c)(2) excludes a
> modification due to conservation efforts and to the presentation of the
> work, including lighting and placement, unless the modification was
> grossly negligent. Generally, the removal of a work from a specific
> location comes within the exclusion because the location is a matter of
> presentation . . . . Under subsection (c)(2), galleries and museums
> continue to have normal discretion to light, frame, and place works of
> art. However, conduct that goes beyond presentation of a work to
> physical modification of it is actionable. For example, Representative
> Markey described the actions of two Australian entrepreneurs who cut
> Picasso's "Trois Femmes" into hundreds of pieces and sold them as
> "original Picasso pieces." This is clearly not a presentation question.
> On the other hand, the Committee believes that the presentation
> exclusion would operate to protect a Canadian shopping center that
> temporarily bedecked a sculpture of geese in flight with ribbons at
> Christmas time.

H.R. Rep. No. 101-514, 101st Cong., 2d Sess. (1990), *reprinted in* 1990

U.S.C.C.A.N. 6915, 6927.

There is no indication here that the presentation exception is limited to

certain categories of art owners. Rather, the passage reflects a stated intent to

accommodate "current practices of the artistic community," which would include

private art collectors and owners such as VLS—or, as specifically noted in the

passage, a private shopping center—as well as museums and galleries. It is

reasonable to assume that museums and galleries are highlighted as examples simply because they display artwork publicly and are the most likely to be subject to a complaint that changes in the manner of displaying a work have modified its presentation.  It almost surely did not occur to Congress (and the passage above reflects no consideration of the possibility) that the law might ever be read to restrict private individuals and institutions from choosing whether or not to display privately owned art.

Equally contrived is Kerson's argument that the presentation exception applies only to "movable" art.  Appellant's Br. at 31-32.  There is nothing in the plain language of the presentation exception that reflects any distinction between the rights of owners of "movable" art as opposed to owners of works incorporated into buildings.  *See* 17 U.S.C. § 106A(c)(2).  While Kerson cites the First Circuit's decision in *Phillips v. Pembroke Real Estate, Inc.*, 459 F.3d 128 (1st Cir. 2006) for the proposition that the public presentation exception does not apply to art that is "permanently affixed . . . in such a way that the mere act of moving it would destroy it," Appellant's Br. at 33 (quoting *Pembroke*, 459 F.3d at 141), he reads too much into that decision.  The court's point in *Pembroke* was that the "possibility of change without destruction is implicit in the public presentation exception." 459 F.3d at 141.  Obviously, there are nondestructive ways to change the presentation of a work short of moving it, such as altering its lighting or

24

installing a cover.[12]  Neither *Pembroke* nor the text of VARA suggests that owners of "non-movable" art are denied the right to make nondestructive changes in presentation, even if they cannot move the work.

A separate provision of VARA does set forth special rules for removal of a work of art that is "incorporated in or made part of a building," as Kerson notes. *See* 17 U.S.C. § 113(d).  However, those rules give owners *greater* flexibility, not less, in dealing with such works: the owner of a "movable" work of recognized stature is always prohibited from destroying the work or from modifying it in a way prejudicial to the artist's honor or reputation, whereas the owner of a work incorporated into a building may, under certain circumstances, take actions to remove the work notwithstanding that removal will destroy or modify the work. *Id.*

The rules pertaining to removal of works incorporated into buildings have no application in this case, as VLS is not at this point seeking to remove the Mural— and more to the point, they are unrelated to the presentation exception.  Congress's inclusion of the presentation exception in VARA reflects its judgment that decisions on how and whether to display works of art would be left to owners, full

---

[12] Notably, the same judge authored both the *Pembroke* decision and the decision in *Massachusetts Museum of Contemporary Art Foundation, Inc. v. Buchel*, 593 F.3d 38 (1st Cir. 2010), which, as discussed below, held that covering a work does not violate VARA.

stop. There is nothing in the text of the exception that justifies distinguishing among different classes of visual art or different types of owners in applying it.[13]

### C. The District Court's Interpretation of VARA Is Consistent with the Pertinent Case Law.

In advocating that VARA be construed to prohibit covering a work of art, Kerson asks the Court not only to depart from the plain language of the statute but also to adopt an interpretation that has no support in existing case law. Two prior court decisions have examined a variation on the question here, and both concluded that covering a work does not implicate the protections codified in VARA.

In the first, *Massachusetts Museum of Contemporary Art Foundation, Inc. v. Buchel*, 593 F.3d 38 (1st Cir. 2010), an artist asserted a claim against MASS MoCA for, among other things, partially covering with tarpaulins an incomplete art installation. As here, the artist contended that the act of covering his work modified and distorted it, thereby violating the right of integrity safeguarded by § 106A(a)(3)(A). The court disagreed:

> [T]he mere covering of the artwork by the Museum, its host, cannot reasonably be deemed an intentional act of distortion or modification

---

[13] Indeed, where Congress has shown, through enactment of § 113(d), greater solicitude for the rights of building owners than for other classes of art owners, it would be anomalous to read into the presentation exception the limitation Kerson advocates. *See United States v. Venturella*, 391 F.3d 120, 126 (2d Cir. 2004) ("A statute should be interpreted in a way that avoids absurd results." (citation omitted)).

of [the plaintiff's] creation. . . . . In our view, a finding that the
Museum's covering of the installation constituted an intentional act of
distortion or modification of [the plaintiff's] artistic creation would
stretch VARA beyond sensible boundaries.

*Buchel*, 593 F.3d at 61-62. While Kerson dismisses *Buchel* as "inapposite"

because it involved a temporary covering that only partially covered the work, *see*

Appellant's Br. at 35, the factual differences between the cases only serve to

underline the fact that Kerson's claim is, if anything, far more tenuous than was the

artist's in *Buchel*. The cover in *Buchel* left part of the work visible and was

described as akin to "hiding an elephant behind a napkin." *Buchel*, 593 F.3d at 61.

As such, the artist had at least a plausible argument that the incomplete covering

constituted "an aesthetic modification of the artwork that gave . . . patrons a

distorted view of it." *Id.* Here, the cover completely removes Kerson's work from

view and leaves nothing to be perceived, thus avoiding any distortion or

modification of the manner in which the work was viewed. Where the partial

cover in *Buchel* did not come within VARA's proscriptions, there can be no

question that the complete covering of the Mural here does not.

The second case, *English v. BFC&R E. 11th St. LLC*, No. 97 CIV. 7446

(HB), 1997 WL 746444 (S.D.N.Y. Dec. 3, 1997), *aff'd sub nom. English v. BFC*

*Partners*, 198 F.3d 233 (2d Cir. 1999), likewise affirmed that "obstruct[ing] the

view" of a work of art without "physically alter[ing it] in any way" would not

violate VARA. *Id.* at *6. At issue in *English* was the construction of a building

27

that would completely obstruct a series of murals on an adjacent parcel but would not "touch the walls on which the murals are painted." *Id.* Kerson attempts to distinguish *English* on the ground that the murals at issue were "unauthorized" and that the action the artist sought to enjoin was construction by a third party on a neighboring parcel, which raised serious public policy concerns. *See* Appellant's Br. at 36. With regard to the first point, only one of the five murals at issue was in fact unauthorized,[14] so that is no ground to distinguish the case. *See English*, 1997 WL 746444 at *1. With regard to the second, it may be true that distinct public policy and constitutional issues would be raised by interpreting VARA to restrict usage of an adjacent property, but Kerson's proposed construction of the statute— which would bind a private party to display a work of art in its own space against its wishes—raises equally concerning issues of compelled speech, as discussed below. Policy concerns aside, the district court's actual holding in *English* was that the "statute cannot be . . . construed" to prohibit obstructing view of a work without physically altering it, *id.* at *6, which is precisely the construction Kerson advocates here.

---

[14] The plaintiff artists sought to protect five murals, one of which was unauthorized; the proposed building would obstruct the unauthorized mural along with three murals on a building the plaintiffs owned. *See English*, 1997 WL 746444 at *1. Defendants claimed that the three murals on plaintiffs' building were illegally placed because plaintiffs trespassed on the adjacent lot to paint them, but the court did not resolve the issue. *Id.* at *4 n.5.

Kerson cites not a single case affirmatively supporting his idiosyncratic reading of VARA—for indeed, there are none.  This is no surprise. For all of the reasons discussed above, the plain language of the statute cannot be contorted to support the proposition that a private owner of a work of art is prohibited from covering the work.  The Court should affirm on that basis.

## II.  THE POTENTIAL RISK OF DETERIORATION OVER TIME DUE TO ENVIRONMENTAL CONDITIONS DOES NOT PRESENT A COGNIZABLE VIOLATION OF VARA.

Kerson's fallback argument represents, in some ways, an even more radical reading of VARA.  Kerson offered no evidence that the installation of a cover over the Mural will cause any immediate physical damage to the work—and, indeed, the undisputed evidence is that VLS designed the cover to avoid impacting the work.  (A90-94, A141.)  Kerson nevertheless contends that VARA authorizes suit to address a hypothetical risk that the cover could create a toxic environment[15] that could ultimately lead to deterioration of the work over time.  Kerson's reading of

---

[15] In representing that his "experts opined" that "the wall . . . *will* create a toxic condition that likely will cause environmental damage to the Murals," Appellant's Br. at 37 (emphasis added), Kerson's brief grossly overstates the undisputed evidence on this point.  As discussed above, Kerson offered opinion evidence from a single expert, who admitted that she did not know whether (and what) the materials used in the cover would off-gas, along with an email from another individual who declined to serve as an expert but suggested that there should be review of what impact the cover materials might have on the work (which, notably, Kerson's retained expert failed to do). (A126, A160-61, A164, A170.) It is simply untrue to represent that the record establishes that the cover "will create a toxic environment."

29

VARA, if accepted, would expose private owners of artwork to potential liability for a range of decisions on the presentation and storage of works of art that fall short of art conservation standards, whether it be hanging a painting in a room with a woodburning fireplace (ambient soot) or exposure to sunlight (UV radiation), or storing artwork in a space subject to variations in temperature or humidity.

In short, Kerson seeks to transform VARA into something it is not: an art conservation statute. His arguments fail for several reasons, not the least of which is that Congress adopted an exception to VARA for changes that occur over time, making clear that it did not intend to subject owners to liability for failure to take adequate steps to preserve a work. But even absent the exception, the possibility—or even probability—that environmental changes will occur to a work at some point in the future does not amount to present evidence of modification or destruction.

## A.   VARA's Express Exception for Changes Occurring Over Time Bars Kerson's Theory of Liability Due to Deterioration.

The Court should reject Kerson's argument in the first instance because it directly conflicts with one of VARA's express exceptions. Section 106A(c)(1) provides as follows:

> The modification of a work of visual art which is a result of the passage of time or the inherent nature of the materials is not a

distortion, mutilation, or other modification described in subsection (a)(3)(A).

17 U.S.C. § 106A(c)(1). Implicit in this language is a distinction between alterations to a work that occur all at once (such as mutilating a painting by cutting it into pieces) and changes that take place over time due to ambient conditions. The potential deterioration of a work over time due to environmental conditions unmistakably falls in the latter category.

There is no merit to Kerson's protestations that the exception cannot apply because it is the "erection of the wall" rather than the passage of time that may eventually lead to deterioration of the Mural. Again, the undisputed evidence confirms that the "erection of the wall" will not itself cause any immediate damage to the Mural. Kerson's contention is that the wall may create conditions that could cause deterioration over time—and, to state the obvious, any disgruntled artist suing over deterioration of her work will necessarily claim that an action or omission by the owner created the conditions for changes to occur. Such was the case in *Flack v. Friends of Queen Catherine Inc.*, 139 F. Supp. 2d 526 (S.D.N.Y. 2001), where the district court cited § 106A(c)(1) in dismissing a claim for damage to a work left exposed to the elements. Kerson attempts to distinguish *Flack* as a case involving "natural environmental factors" not created by the defendant, but, in fact, the plaintiff in *Flack* squarely alleged that the deterioration to her work was the result of defendant's "grossly negligent" or "intentional" conduct in placing her

31

work outdoors. *Id.* at 534. If the "passage of time" exception were limited to changes caused by conditions for which the owner had no possible responsibility, it would lack any practical effect.

It is significant that the original—but rejected—language proposed for § 106A(c)(1) would have limited the exception in much the manner Kerson argues for here. The initial draft exempted from liability changes due to the passage of time "unless the modification was the result of gross negligence in maintaining or protecting the work." H.R. Rep. No. 101-514, 101st Cong., 2d Sess. (1990), *reprinted in* 1990 U.S.C.C.A.N. 6915, 6915 (emphasis added). This qualifier would have imposed a standard of care on owners of works of art and rendered them liable for failure to take adequate steps to preserve a work. As enacted, the exemption omitted the qualifier, *see* 17 U.S.C. § 106A(c)(1), and thus it exempts changes due to the passage of time *regardless* of the level of care exercised in maintaining and protecting the work. *See Flack*, 139 F. Supp. 2d. at 534 (noting that the exception applies "even if the modification is caused by gross negligence"). The question of whether VLS's erection of the wall was appropriately protective of the Mural or, conversely, increased the risk of conditions that could cause the Mural to deteriorate over time is irrelevant to the application of § 106A(c)(1).

In resisting application of the exception, Kerson also suggests that the courts in this circuit already addressed substantially the same issue in *Cohen v. G&M Realty L.P.*, 320 F. Supp. 3d 421 (E.D.N.Y. 2018), *aff'd sub nom. Castillo v. G&M Realty L.P.*, 950 F.3d 155 (2d Cir. 2020). As Kerson himself notes, however, the defendant in *G&M Realty* whitewashed a series of building walls on which the plaintiffs' murals were painted. The district court held (unremarkably) that § 106A(c)(1) did not apply because the "whitewashing was not caused by the 'passage of time' or the 'inherent nature of the materials'" but rather by the defendant "throwing paint on the works." *Id.* at 436. In other words, the defendant's actions did not simply create conditions that could lead to deterioration over time—they directly modified and, indeed, destroyed the works. Here, in contrast, installing a cover over the Mural will not cause any immediate harm, and Kerson's claim that the cover could lead to changes *over time* falls squarely within the aegis of § 106A(c)(1).

## B. Even Absent the "Passage of Time" Exception, the Risk of Deterioration to the Mural Would Not Make Out a Violation of VARA.

While VLS submits that § 106A(c)(1) requires rejection of Kerson's arguments, even if the exception did not apply, the risk of deterioration over time due to the installation of a cover over the Mural would not fall within the scope of VARA's prohibitions. VARA creates a cause of action to address only the (1)

33

"intentional distortion, mutilation, or other modification of [a] work which would be prejudicial to [the artist's] honor or reputation" and (2) "intentional or grossly negligent destruction" of a work, 17 U.S.C. § 106A(a)(3), neither of which is implicated on the undisputed facts here.

Both prongs of § 106A(a)(3) require an intentional—or, in the case of destruction, grossly negligent—act of modification or destruction. This limitation to intentional or grossly negligent conduct was a change from the original text of the bill that became VARA, which would have applied to "any destruction, distortion, mutilation, or other modification . . . which is the result of an intentional *or negligent act or omission* with respect to that work." H.R. Rep. No. 101-514, 101st Cong., 2d Sess. (1990), *reprinted in* 1990 U.S.C.C.A.N. 6915, 6915 (emphasis added). Under the statute as enacted, negligence does not suffice to make out a violation of VARA.

VLS's actions in erecting a cover, even if arguably not comporting with best practices in the field of art conservation, cannot be said to amount to an intentional or grossly negligent act of destruction or modification. Kerson may contend that the intent and "sole rationale" of the cover was to destroy the Mural, Appellant's Br. at 39, but these bare assertions are contradicted by the evidence in the record. It is true that VLS initially intended to paint over the Mural, but upon becoming aware of VARA, VLS proposed a cover as a nondestructive alternative—and it is

34

undisputed that VLS designed the cover to avoid damaging the Mural. (A90-94, A141.) VLS's goal was not to destroy the Mural, but to remove it from the everyday view of students and others who find it offensive, in a manner that satisfied its obligations under VARA. VLS also sought in part to protect the controversial work of art from potential vandalism—a legitimate concern given attacks on divisive works of public art in Vermont and elsewhere over recent years.[16] (A116.)

When Kerson raised concerns about potential humidity and temperature variations behind VLS's proposed cover, VLS offered to install humidity and temperature monitors behind the cover to address those concerns. (A116-17.) Kerson may dispute whether VLS's course of conduct has been adequately protective, but the undisputed facts in the record below failed to make out any intention to destroy or modify the work through installation of the cover, or "conduct that evinces a reckless disregard for the rights of others or smacks of intentional wrongdoing" sufficient to make out gross negligence. *Curley v. AMR Corp.*, 153 F.3d 5, 13 (2d Cir. 1998) (citation omitted).

---

[16] *See, e.g.*, Aidan Quigley, *Controversial Burlington Mural Vandalized Again*, VTDigger (Nov. 2, 2018), https://vtdigger.org/2018/11/02/controversial-burlington-mural-vandalized/ (last accessed May 4, 2022); Sawyer Loftus & Elizabeth Hewitt, *Police Investigate Vandalism of Black Lives Matter Mural*, VTDigger (June 14, 2020), https://vtdigger.org/2020/06/14/police-investigate-vandalism-of-black-lives-matter-mural/ (last accessed May 4, 2022).

Nor do the undisputed facts in the record below establish any harm remediable by the relevant provisions of VARA. Section 106A(a)(3)(A) prohibits only a distortion, mutilation, or modification of a work of art "which would be prejudicial to [the artist's] honor or reputation." Any changes that might occur over time due to environmental conditions would not reflect on Kerson's "honor or reputation" in a prejudicial manner—nor could they, as nobody will see the work once the cover has been installed.

While § 106A(a)(3)(B) (prohibiting destruction of a work) is not limited to acts that bear on an artist's honor or reputation, there was no evidence that any deterioration that might occur to the Mural over time would rise to the level of "destroying" the work. Even accepting the almost entirely speculative testimony from Kerson's expert that there is a risk of damage over time, the mere fact that a work of art may be damaged at some undetermined time in the future does not create a cause of action for destruction under VARA. *See Flack*, 139 F. Supp. 2d at 534 (damage to sculpture that did not destroy it could not make out claim for destruction under VARA); *Tobin v. The Rector*, No. 17 CIV. 2622 (LGS), 2017 WL 5466705, at *6 (S.D.N.Y. Nov. 14, 2017) (same), *aff'd* 735 F. App'x 32 (2d Cir. 2018). Kerson's contention that there may be "gradations of 'destruction,'" Appellant's Br. at 43, suggesting that small changes or damage may qualify as "destroying" a work, is inconsistent with the plain meaning of the term and would

36

erase any reasonable distinction between "destruction" and "distortion, mutilation, or other modification" of a work. *See Duncan v. Walker*, 533 U.S. 167, 174 (2001) (statutes should be read so as "to give effect, if possible, to every clause and word of a statute" (quotation marks and citation omitted)).

For all of these reasons, the risk of deterioration to the Mural over time due to allegedly insufficient conservation measures cannot make out a colorable claim under VARA.

## III. AS CONSTRUING VARA TO PROHIBIT A PRIVATE PARTY FROM DISCONTINUING DISPLAY OF A MURAL WOULD PRESENT GRAVE FIRST AMENDMENT CONCERNS, THE CANON OF CONSTITUTIONAL AVOIDANCE FAVORS AFFIRMANCE.

The plain language of VARA should resolve the issues raised by Kerson in this appeal. If, however, the Court were to find any latent ambiguity in the language of statute, the canon of constitutional avoidance counsels a reading of VARA that avoids the manifest First Amendment concerns raised by the prospect of compelling a private party to continue the public display of a work it wishes to cover.

The canon of constitutional avoidance is a principle of statutory construction and judicial restraint that functions as "a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional

37

doubts." *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005). "Under the doctrine, when a court is confronted with two plausible constructions of a statute, . . . that court must adopt the construction that avoids the constitutional issues." *United States v. Martinez*, 525 F.3d 211, 215–16 (2d Cir. 2008) (citing *Clark*, 543 U.S. at 380); *see also Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 173 (2001) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." (citation and quotation marks omitted)).

There can be no question that the construction of VARA advanced by Kerson presents serious First Amendment problems, for a decision to display or not to display a work of art or a monument is a core expressive act. In *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460 (2009), for example, the Supreme Court held that a city could not be forced to display a monument it chose not to display, invoking "the obvious proposition that a monument that is commissioned and financed by a government body for placement on public land constitutes government speech." *Id.* at 470. As VLS is a private institution, its decision as to what art to display or not to display represents a clear exercise of its First Amendment rights of free speech and institutional academic freedom. *Cf. Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 (1985) (noting reluctance "to trench

38

on the prerogatives of state and local educational institutions and our responsibility to safeguard their academic freedom, a special concern of the First Amendment" (citation and quotation marks omitted)).

Interpreting a federal statute to *prohibit* a private law school from displaying a mural would pose obvious First Amendment issues. Reading a federal statute to *require* such a display would be no less constitutionally offensive—indeed, it would pose a greater encroachment upon the institution's rights. *See Burns v. Martuscello*, 890 F.3d 77, 85 (2d Cir. 2018) ("[B]etween compelled silence and compelled speech, compelled speech is the more serious incursion on the First Amendment."). It is well established that the First Amendment protects the "right to decide what to say and what not to say." *Jackler v. Byrne*, 658 F.3d 225, 241 (2d Cir. 2011); *see also Riley v. Nat'l Fed'n of the Blind*, 487 U.S. 781, 796-97 (1988) (same). As the right not to speak is "central to our system of government," compelled speech represents a "severe intrusion" on liberty. *Burns*, 890 F.3d at 84.

In one of the seminal cases in this area, *Wooley v. Maynard*, 430 U.S. 705, 714 (1977), the Supreme Court affirmed the right of a citizen to tape over the motto displayed on New Hampshire license plates, "Live Free or Die." The Court "reasoned that requiring even 'the passive act of carrying the state motto on a license plate' violated the First Amendment," as it made the plaintiff an "instrument" for a "'point of view he [found] unacceptable.'" *Burns*, 890 F.3d at

39

85 (*quoting Wooley*, 430 U.S. at 715).  Here, just as in *Wooley*, VLS seeks to

dissociate itself from a form of expression it does not wish to endorse.  Compelling

VLS to continue display of the Mural would plainly trammel on its First

Amendment rights of free expression.[17]

 In the proceedings below, Kerson argued that because VLS originally

invited the artwork at issue, VLS could not be heard to complain when, thirty years

later, it determined that the work was no longer consistent with its mission and

values.  Not so.  Respect for "the individual autonomy of intellect and will" lies at

the core of the First Amendment, *Carroll v. Blinken*, 957 F.2d 991, 996 (2d Cir.

1992), and inherently includes the right to change one's mind.  Sensibilities evolve,

and, as the District Court's Order recognized, over time the Kerson murals have

acquired a symbolic significance now recognized as incompatible with the values

of VLS.  *Cf. Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2082 (2019)

(observing that "as time goes by, the purposes associated with an established

monument, symbol, or practice often multiply").  VLS has a First Amendment

right to determine that time has passed the Kerson murals by and that it no longer

chooses to place them on open display.

---

[17] Kerson himself plainly recognizes that the decision not to display his work
reflects an expression of VLS's institutional views, as he opposes VLS's actions—
and asks the Court to intervene—precisely because of the message that he believes
the decision to discontinue display of his work conveys.  *See* Appellant's Br. at 30
(contending that removing his work from display "announc[ed] to the world that
the Murals are offensive, racist and unworthy to be viewed").

In sum, to interpret VARA in a manner that shackled private institutions and individuals to a particular point of view for decades, prohibiting an evolution of thought, would be fundamentally at odds with the First Amendment. VLS submits that the Court need not reach these concerns, as the plain language of VARA cannot reasonably be read to preclude an institution from covering a mural it no longer wishes to display. Even were the Court to find that Kerson had offered a plausible alternative interpretation of VARA, principles of constitutional avoidance would militate in favor of adopting the interpretation that avoids direct collision with the First Amendment and affirming the District Court's grant of summary judgment.

## CONCLUSION

It is difficult to overstate the radical nature of the proposition Kerson advocates in this appeal: he contends that the rights granted to him under VARA trump the interests of VLS, a private educational institution, in deciding whether or not to display his work. There is simply no support in the text of VARA for Kerson's idiosyncratic interpretation—and, for the reasons set forth above, to construe the law as Kerson seeks would raise serious constitutional issues. A private institution has the right to choose what speech and expression it endorses, including what artwork it displays on its walls. As Kerson's attempt to prevent

VLS from exercising that right finds no basis in the law, VLS respectfully requests that the Court affirm the District Court's grant of summary judgment.

Dated at Burlington, Vermont, this 3rd day of June, 2022.

*/s/ Justin B. Barnard*
Justin B. Barnard, Esq.
Karen McAndrew, Esq.
DINSE P.C.
209 Battery Street
P. O. Box 988
Burlington, VT  05402-0988
jbarnard@dinse.com
kmcandrew@dinse.com
(802) 864-5751

*Attorneys for Appellee*

42

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Justin B. Barnard, Esq., counsel for Appellee, hereby certify the following pursuant to Fed. R. App. P. 32(a)(7) and Local Rule 32.1:

1. This Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) and Local Rule 32.1 because this Brief contains 10,142 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this Brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in Times New Roman 14 point font.

Dated at Burlington, Vermont, this 3rd day of June, 2022.

/s/Justin B. Barnard
Justin B. Barnard, Esq.
Karen McAndrew, Esq.
DINSE P.C.
209 Battery Street
P. O. Box 988
Burlington, VT  05402-0988
jbarnard@dinse.com
kmcandrew@dinse.com
(802) 864-5751

*Attorneys for Appellee*