# 21-2904

---

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

---

SAMUEL KERSON
Plaintiff-Appellant

v.

VERMONT LAW SCHOOL, INC.
Defendant-Appellee

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT
No. 5:20-cv-00202 (Hon. Geoffrey Crawford)

---

BRIEF OF AMICUS CURIAE AMERICAN CIVIL
LIBERTIES UNION OF VERMONT IN SUPPORT OF DEFENDANT-
APPELLEE VERMONT LAW SCHOOL, INC.

---

Lia N. Ernst
ACLU Foundation of Vermont
PO Box 277
Montpelier, VT 05601
(802) 223-6304

June 10, 2022

**CORPORATE DISCLOSURE STATEMENT**

Amicus American Civil Liberties Union of Vermont makes the following corporate disclosure statement pursuant to Fed. R. App. P. 26.1(a):

The American Civil Liberties Union of Vermont has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Corporate Disclosure Statement ..........................................................i

Table of Contents ...............................................................................ii

Table of Authorities ..........................................................................iii

Interest of Amicus.............................................................................. 1

Argument .......................................................................................... 5

   I.    VARA Cannot Constitutionally Be Interpreted to Require an
Unwilling Private Party to Display Expressive Content Inconsistent
with Its Mission and Values........................................................... 5

    a.   Background Constitutional and Statutory Construction
Principles ................................................................................. 5

       1.  The canon of constitutional avoidance ................................. 5

       2.  Compelled speech ................................................................ 6

    b.   The Doctrine of Constitutional Avoidance Mandates that this
Court Reject an Interpretation of VARA that Would Compel VLS
to Continue to Display the Murals................................................8

Conclusion .......................................................................................17

Certificate of Compliance................................................................. 19

TABLE OF AUTHORITIES

**Cases**

*Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) ..................................................................................................... 3

*Bombard v. Riggen*, No. 21-CV-176, 2021 WL 8202011 (Vt. Super. Ct. Dec. 21, 2021) ................................................................................................ 2

*Burns v. Martuscello*, 890 F.3d 77 (2d Cir. 2018) ....................................... 6

*Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77 (2d Cir. 1995) .......................... 13

*Clark v. Martinez*, 543 U.S. 371 (2005) ........................................................ 5

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995) ................................................................................................. 11

*Mia. Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974) .............................. 7

*Morris v. City of New Orleans*, 399 F. Supp. 3d 624 (E.D. La. 2019) .......... 3

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) ...................... 3

*Nelson v. Streeter*, 16 F.3d 145 (7th Cir. 1994) ......................................... 10

*Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1 (1986) (plurality op.) ................................................................................... 7, 8

*Phillips v. Pembroke Real Estate, Inc.*, 288 F. Supp. 2d 89 (D. Mass. 2003) ................................................................................................. 13, 14, 15

*Phillips v. Pembroke Real Estate, Inc.*, 459 F.3d 128 (1st Cir. 2006) .... 13, 15

*Phillips v. Pembroke Real Estate, Inc.*, 819 N.E.2d 579 (Mass. 2004) ........ 15

*Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) .............................. 10

*Pub. Utils. Comm'n v. Pollak*, 343 U.S. 451 (1952) .................................... 10

*Pulphus v. Ayers*, 249 F. Supp. 3d 238 (D.D.C. 2017) ................................ 11

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781 (1988) ........... 7, 8

*Serra v. U.S. Gen. Servs. Admin.*, 847 F.2d 1045 (2d Cir. 1988) ................ 17

*State v. Schenk*, 190 A.3d 820 (Vt. 2018) .................................................... 2

*United States ex rel. Att'y Gen. v. Del. & Hudson Co.*, 213 U.S. 366 (1909) . 5

*United States v. Oakland Cannabis Buyers' Co-op*, 532 U.S. 483 (2001) .... 6

*United States v. X-Citement Video, Inc.*, 513 U.S. 64 (1994) ................... 5, 6

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ..................... 6, 7

*Wooley v. Maynard*, 430 U.S. 705 (1977) ................................................... 6, 7

**Other Authorities**

Judicial Improvements Act of 1990, Pub. L. No. 101-650, 104 Stat. 5089 . 12

## Other Documents

Compl., *ACLU Foundation, Inc. v. Agata*, No. 1:16-cv-09854 (S.D.N.Y. filed Dec. 21, 2016) ............................................................................................ 2

Compl., *Vinson v. Donovan*, No. 2:22-cv-20 (D. Vt. filed Jan. 27, 2022) .... 1

First Am. Compl., *Migrant Justice v. Nielsen*, No. 5:18-cv-192 (D. Vt. filed Jan. 31, 2019) .............................................................................................. 2

Jay Diaz, *Burlington Mask Law: Changes Not Enough*, ACLU of Vermont (Mar. 5, 2016, 8:13am) ............................................................................... 4

Jay Diaz, *Victory! Vermont Cities and Towns Repeal Unconstitutional Anti-Panhandling Ordinances*, ACLU of Vermont (Oct. 19, 2018, 8:45am) ....................................................................................................... 4

Written Testimony of Harrison Stark, ACLU of Vermont Staff Attorney, to Vermont Senate Committee on the Judiciary (Jan. 28, 2022) ................. 4

## INTEREST OF AMICUS

The American Civil Liberties Union of Vermont (ACLU-VT) is a nonprofit, nonpartisan organization founded in 1967 to protect and advance the civil rights and civil liberties of all Vermonters.[1] The ACLU-VT strives to ensure that the rights guaranteed by the Vermont and United States Constitutions—including the rights enshrined in the First Amendment—are protected equally under the law.[2]

The ACLU-VT has approximately 8,000 members throughout the state and is the statewide affiliate of the national ACLU, which has nearly two million members nationwide. The ACLU and its affiliates have appeared in countless lawsuits to protect First Amendment rights. We have represented or filed amicus briefs in support of both would-be speakers whose speech was suppressed, *see, e.g.*, Compl., *Vinson v. Donovan*, No. 2:22-cv-20 (D. Vt. filed Jan. 27, 2022) (arguing state statute prohibiting

---

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), the undersigned certifies that no party's counsel authored the brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than the amicus curiae, its members, or its counsel—contributed money that was intended to fund preparing or submitting the brief.

[2] Amicus wishes to acknowledge the substantial assistance of Harrison Stark, ACLU of Vermont Staff Attorney, in the drafting of this brief.

1

disturbing the peace by electronic means facially violates First
Amendment)[3]; *Bombard v. Riggen*, No. 21-CV-176, 2021 WL 8202011 (Vt.
Super. Ct. Dec. 21, 2021) (denying motion to dismiss claims that stops and
arrest for display of middle finger violated First and Fourth Amendments);
First Am. Compl., *Migrant Justice v. Nielsen*, No. 5:18-cv-192 (D. Vt. filed
Jan. 31, 2019) (alleging Immigration and Customs Enforcement agents
targeted prominent immigrants right activists for arrest and deportation to
chill and in retaliation for their political speech)[4]; *State v. Schenk*, 190 A.3d
820 (Vt. 2018) (amicus brief arguing First Amendment protected speech of
man who left KKK fliers at residences),[5] and would-be non-speakers whose
speech was compelled, *see, e.g.*, Compl., *ACLU Foundation, Inc. v. Agata*,
No. 1:16-cv-09854 (S.D.N.Y. filed Dec. 21, 2016) (challenging law
compelling non-profit organizations engaging in issue-oriented expression
to disclose information about certain contributors, communications, and

---

[3] Available at https://www.acluvt.org/sites/default/files/1.27.22_-_vinson_complaint.pdf.

[4] Available at https://www.acluvt.org/sites/default/files/field_documents/2019-02-07_amended_complaint.pdf.

[5] Amicus Brief available at http://mediad.publicbroadcasting.net/p/vpr/files/201610/amicus-ACLU-schenk.PDF.

expenditures)[6]; *Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) (amicus brief in case finding unconstitutional law requiring domestic organizations receiving federal funding to adopt policies conveying government's message about prostitution).[7] We have represented artists and have argued for the key role that artistic expression plays in democratic discourse. *See, e.g.*, *Morris v. City of New Orleans*, 399 F. Supp. 3d 624 (E.D. La. 2019) (challenging ordinance requiring property owners to obtain prior approval from city and pay a fee before putting up murals); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) (amicus brief arguing law requiring NEA to consider "general standards of decency and respect" in issuing grants to artists chilled artistic expression in violation of First Amendment).[8] Like all ACLU affiliates, the ACLU-VT also regularly advocates before state and local bodies in support of First Amendment freedoms. *See, e.g.*, Written Testimony of Harrison Stark, ACLU of Vermont Staff Attorney, to Vermont Senate Committee on the

---

[6] Available at https://www.nyclu.org/sites/default/files/releases/Ethics-bill-complaint_0.pdf.

[7] Amicus Brief available at https://www.nyclu.org/sites/default/files/12-10%20bsac%20American%20Civil%20Liberties%20Union.pdf.

[8] Amicus Brief available at https://www.aclu.org/legal-document/aclu-amicus-brief-national-endowment-arts-v-finley.

Judiciary (Jan. 28, 2022) (arguing that bill that would expand criminal threatening statute risked chilling protected speech)[9]; Jay Diaz, *Victory! Vermont Cities and Towns Repeal Unconstitutional Anti-Panhandling Ordinances*, ACLU of Vermont (Oct. 19, 2018, 8:45am), https://www.acluvt.org/en/news/victory-vermont-cities-and-towns-repeal-unconstitutional-anti-panhandling-ordinances (describing successful advocacy by ACLU-VT to urge six towns to repeal panhandling ordinances that violated First Amendment); Jay Diaz, *Burlington Mask Law: Changes Not Enough*, ACLU of Vermont (Mar. 5, 2016, 8:13am), https://www.acluvt.org/en/news/burlington-mask-law-changes-not-enough (detailing advocacy effort to force changes to mask ordinance to comply with First, Fourth, and Fourteenth Amendments).

This case has expressive and speech equities on both sides. The ACLU-VT appears as Amicus to emphasize the applicable First Amendment principles and explain why, in this case, they favor Appellee Vermont Law School (VLS).

---

[9] Available at https://legislature.vermont.gov/Documents/2022/WorkGroups/Senate%20Judiciary/Bills/S.265/Public%20Comments/S.265~Harrison%20Stark~Written%20Testimony%20from%20the%20Vermont%20ACLU~1-28-2022.pdf.

**ARGUMENT**

**I.   VARA Cannot Constitutionally Be Interpreted to Require an Unwilling Private Party to Display Expressive Content Inconsistent with Its Mission and Values**

   a.  Background Constitutional and Statutory Construction Principles

      1.  The canon of constitutional avoidance

The canon of constitutional avoidance provides that, "where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [a court's] duty is to adopt the latter." *United States ex rel. Att'y Gen. v. Del. & Hudson Co.*, 213 U.S. 366, 408 (1909). Under this canon, courts "do not impute to Congress an intent to pass legislation that is inconsistent with the Constitution as construed by [the courts]." *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 73 (1994); *id.* at 68-69 (interpreting "knowingly" in criminal statute to apply to multiple elements of criminal offense, even though "most natural grammatical reading" would limit its application to first element only, where doing otherwise would raise "substantial constitutional questions"). When faced with conflicting interpretations of a statute, one of which gives rise to "serious constitutional doubts," *Clark v. Martinez*, 543 U.S. 371, 381 (2005), courts must "read the statute to eliminate those doubts so long as such a reading is

5

not plainly contrary to the intent of Congress," *X-Citement Video*, 513 U.S. at 78. However, "the canon of constitutional avoidance has no application in the absence of statutory ambiguity." *United States v. Oakland Cannabis Buyers' Co-op*, 532 U.S. 483, 494 (2001).

### 2. Compelled speech

"[T]he right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all. . . . The right to speak and the right to refrain from speaking are complementary components of the broader concept of individual freedom of mind." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (citations and internal quotation marks omitted). The Supreme Court has been clear that governmental compulsions to speak will be met with the most exacting scrutiny. In *West Virginia State Board of Education v. Barnette*, for example, the Court noted that speech can be suppressed only when "the expression presents a clear and present danger of action of a kind the State is empowered to prevent and punish. . . . [and it] would seem that involuntary affirmation could be commanded only on even more immediate and urgent grounds than silence." 319 U.S. 624, 633 (1943); *see also Burns v. Martuscello*, 890 F.3d 77, 85 (2d Cir. 2018) ("In our view, compelled speech presents a unique affront to personal dignity. . . . [T]he

6

right *not* to speak may be abrogated only under carefully policed circumstances.").

The Supreme Court has repeatedly affirmed that the government may not compel an unwilling speaker to speak—whether through the forced expression of the government's message, a third party's message, or the unwilling speaker's own message. The Court has thus held unconstitutional: a regulation requiring public school students to salute the flag and recite the pledge of allegiance, *Barnette*, 319 U.S. at 642 a statute requiring drivers to display the New Hampshire state motto on their license plates, effectively requiring them to "use their private property as a 'mobile billboard' for the State's ideological message," *Wooley*, 430 U.S. at 715; a statute requiring newspaper publishers to print political candidates' replies to "criticism and attacks on [their] record by [the] newspaper," *Mia. Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 243, 258 (1974); an order that a private utility company include in its mailings a third party's newsletter, *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1 (1986) (plurality op.); and a law requiring professional fundraisers to disclose the percentage of donations they receive that they retain as fees versus turning over to the charity, *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781 (1988).

In each of these cases, compelling a speaker to convey a message it wouldn't otherwise convey necessarily altered the speaker's speech and thus was treated as a content-based speech regulation. *E.g.*, *Riley*, 487 U.S. at 795 ("Mandating speech that a speaker would not otherwise make necessarily alters the content of the speech. We therefore consider the Act as a content-based regulation of speech."); *Pac. Gas & Elec.*, 475 U.S. at 9 ("Compelled access like that ordered in this case both penalizes the expression of particular points of view and forces speakers to alter their speech to conform with an agenda they do not set."). Such regulations will stand only if they are "a narrowly tailored means of serving a compelling state interest." *Pac. Gas & Elec.*, 475 U.S. at 19. Each of these cases failed that test.

> b.  The Doctrine of Constitutional Avoidance Mandates that this Court Reject an Interpretation of VARA that Would Compel VLS to Continue to Display the Murals

Amicus recognizes that there are speech and expression equities on both sides of this case. Samuel Kerson seeks to display a deeply personal work of visual art, expressing what the artist intended as a powerful political statement abhorring the injustice of slavery. But VLS no longer wishes to display his message, after concluding that this expressive work causes some members of its community to feel excluded and devalued. In

many ways, this dispute revolves around the finer points of VARA's statutory terms—but at the heart of this appeal is a tension between an artist's expressive vision and an institution's own, shifting, understanding of that expressive work, decades after the work was originally installed.

That tension is uncomfortable, and Kerson, the public, and even this Court may disagree with VLS's choice to no longer display the mural. But it is a tension that the Constitution leaves to private speakers, not the courts, to resolve. The First Amendment fully protects a private speaker's decision not to speak a message—even an artistic one, and VARA cannot, consistent with the Constitution, be interpreted so as to give a private entity no choice but to continue displaying expressive content that does not accord with its values or mission.

Although Amicus is sensitive to Kerson's understandable interest in displaying his art, bedrock First Amendment principles demonstrate that the Constitutional equities lie firmly with VLS, not Kerson. To be sure, Kerson unquestionably has a First Amendment right to make his art, and, as this litigation reflects, has an expressive *interest* in the continued display of the murals. But he does not have (and does not claim to have, to Amicus's knowledge) a First Amendment *right* to a court order directing that VLS continue to display those murals. A private institution's decision

9

to not display a work of art cannot violate the First Amendment for the simple reason that, barring circumstances not present here, private institutions are not subject to the First Amendment's prohibitions. *See, e.g.*, *Pub. Utils. Comm'n v. Pollak*, 343 U.S. 451, 461 (1952) (noting that the First Amendment "appl[ies] to and restrict[s] only the Federal Government and not private persons" (collecting cases)). Rather, any right Kerson could have regarding the continued display of his murals would come exclusively from VARA's recognition of his moral right to integrity—but as the District Court noted below, "[n]o court has ruled that VARA protects the artist's interest in keeping his art visible or on display." (A223)

On the other hand, VLS's decision about whether to display the murals is protected by the First Amendment; an entity's display of a work of art is that entity's own speech. *See, e.g.*, *Pleasant Grove City v. Summum*, 555 U.S. 460, 470-71 (2009) ("Just as government-commissioned and government-financed monuments speak for the government, so do privately financed and donated monuments that the government accepts and displays to the public on government land."); *Nelson v. Streeter*, 16 F.3d 145, 148 (7th Cir. 1994) (denying immunity from First Amendment lawsuit to city aldermen who removed painting they found offensive from private art gallery wall; "The City does not own the Art Institute, and its

officials have no more right to enter it uninvited and take the art off its walls than they would have to enter a private home and take 'offensive' art off its walls."); *Pulphus v. Ayers*, 249 F. Supp. 3d 238, 253-54 (D.D.C. 2017) (finding no likelihood of success on artist's First Amendment claim where government concededly exercised viewpoint discrimination in selection of art to display in art competition because the exhibition was government speech); *cf. Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 574 (1995) (holding that organizer of private parade, in selecting some "expressive units" to participate and excluding others, "clearly decided to exclude a message it did not like from the communication it chose to make, and that is enough to invoke its right as a private speaker to shape its expression by speaking on one subject while remaining silent on another").

Because displaying art is speech, an order compelling a private entity like VLS to continue to display the murals necessarily is compelled speech. Indeed, Kerson admits that the communicative content of the artwork forms the basis of VLS's decision not to display his work: "Respondent's covering of the artwork is *solely because of its content*. In that this case is unique. All other cases litigated under VARA involved acts in which the changes to the artwork were the by-product of other economic or business

reasons. Here, it is the only reason." Appellant's Br. At 29 (emphasis added). But that's precisely what makes VLS's compelled speech argument so strong: the institution no longer wishes to communicate the message associated with the mural. The First Amendment grants a private entity like VLS the right not to convey a message for any reason it chooses, including, for example, choosing not to display a work of art that it no longer wishes to incur the expense of maintaining. But First Amendment protection is at its apex where, as here, a private entity chooses not to display a work of art because the *content* conveys a message the entity does not wish to convey.

Congress was sensitive to this First Amendment backdrop when it enacted VARA, expressly providing that "[t]his title does not authorize any governmental entity to take any action or enforce restrictions prohibited by the First Amendment to the United States Constitution." Judicial Improvements Act of 1990, Pub. L. No. 101-650, § 609, 104 Stat. 5089. Consistent with that proviso, this Court has recognized that even if VARA confers some type of right to insist on continued public presentation of a work of art, that statutory right cannot be vindicated at the expense of private parties' constitutional rights: Considering three artists' request for an injunction prohibiting a private entity from removing their work, this Court noted, "[f]rom such reflection it follows that American artists are to

be encouraged by laws that protect their works. Although Congress in the [VARA] did just that, it did not mandate the preservation of art at all costs and without due regard for the rights of others." *Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 80 (2d Cir. 1995).[10] But that is precisely what Kerson's reading of VARA would do.

Unsurprisingly, Kerson points to no case where VARA required a private entity to display art antithetical to that speaker's values or preferences. In fact, Amicus is aware of only one case interpreting the First Amendment to *allow* VARA to mandate continued display of artwork—and even this case ultimately supports VLS's position here. In *Phillips v. Pembroke Real Estate, Inc.*, only one year after the plaintiff-artist had completed 27 sculptures for a Boston park and installed, among other things, "mosaic paving stones, granite feature strips, and rough stone walls," the defendant's "aesthetic vision" for the park had changed. 288 F. Supp. 2d 89, 94 (D. Mass. 2003), *aff'd on other grounds*, 459 F.3d 128 (1st Cir. 2006). A re-design called for removal and relocation of all 27 sculptures, prompting the litigation. *Id.*

---

[10] The court ultimately concluded that the work in question was a work made for hire and not within VARA's protections; it therefore did consider whether the private entity could be compelled to continue to display the artwork. *Id.* at 85-88.

The court ultimately ruled for the artist, but it did so on *state* law grounds. Critically for this case, the court rejected the plaintiff's argument that VARA conferred on artists any right to continued display of their art, noting that, "[d]espite 'le droit moral,' Congress adhered to 'chacun a son gout' (each one to his taste) by declining to require the public presentation of art." *Id.* at 100. Therefore, under VARA, the defendant was "not obligated to display the works in the Park, as VARA provides no protection for a change in placement or presentation." *Id.*

True, in applying a state statute that provided artists broader protections, the court considered and rejected the defendant's "interesting but scantily-briefed" compelled speech argument, *id.* at 103. But again, the court's logic makes clear why VLS's compelled-speech argument should prevail. In *Phillips*, the unwilling speaker was a private entity, but a private entity managing a *public* park. *Id.* at 93 ("[T]his is the only privately-managed public park in the City of Boston."). The court cited four grounds for rejecting the defendant's compelled-speech objection; all four relied at least in part on the park's public status:

(1) "Defendant, a highly sophisticated real estate development firm, agreed to place Plaintiff's sculpture in a public park and did not

obtain a written waiver of [state statutory] rights—as it easily could have done under the law."

(2) "Defendant has a diminished claim to First Amendment protection because it agreed to manage a public park and it voluntarily agreed that it would not alter the site without the permission of numerous government agencies."

(3) "Defendant has a right to regulate the time, place and manner of artistic expression in its park so long as its regulation is not content-based. Here, though, there is persuasive evidence that Defendant intended to eliminate Plaintiff's artwork because he exercised his First Amendment rights in bringing this action."[11]

(4) "[E]ven if [the state law] burdens protected speech, it serves a compelling state interest" of preserving the integrity of art and encouraging its creation.

*Id.* at 103-04.[12]

---

[11] Amicus notes that this would appear to be a better fit for a First Amendment retaliation claim than a content-discrimination claim.

[12] After initially granting a preliminary injunction, the District Court vacated it after the Massachusetts Supreme Judicial Court answered in the negative the District Court's certified question as to whether the state statute applied to the art in question. *See Phillips v. Pembroke Real Estate, Inc.*, 819 N.E.2d 579 (Mass. 2004); *see also Phillips*, 459 F.3d at 132 (reciting procedural history).

VLS is a private entity. And each of these factors compels the opposite conclusion here:

(1) VLS did not undertake to display the murals at issue here in a public location.

(2) VLS, as a private entity, enjoys the full protection of the First Amendment and did not enter any sort of agreement requiring government permission to alter the murals; as the court put it, "[a]n owner of purely private property would have a stronger First Amendment interest in his own artistic expression—and the right to change his mind about artistic merit after purchasing art," *id.* at 104.

(3) While the First Amendment prohibits governments from engaging in content discrimination in regulating the time, place, and manner of speech, VLS is under no such restriction and, on the contrary, has a protected right to endorse or not endorse speech based on its content.

(4) Even if the encouraging the creation and protection of works of recognized stature is a compelling government interest, forcing unwilling private parties to display that art is not the least restrictive means of furthering that interest.

To be sure, a purely public entity operating a public space or forum for speech would pose harder questions for applying VARA—questions not

presented here. Amicus expresses no view on whether VARA can or should be interpreted to require unwilling *public* entities to continue to display certain works of art. But Amicus merely notes that this Court has recognized that even in the context of the *government's* display of art, an artist's speech rights do not prevail above all other considerations. *See Serra v. U.S. Gen. Servs. Admin.*, 847 F.2d 1045 (2d Cir. 1988) (holding that (1) government is free to exercise its own speech rights in removing sculpture from federal property and (2) to the extent artist retained any First Amendment right in sculpture sold to government, removal was reasonable time, place, and manner restriction).[13]

This precedent makes clear that the Court should reject a ruling that would compel VLS, a private entity and unwilling speaker, to nevertheless speak through the continued—but unwanted—display of the murals.

## CONCLUSION

For the reasons set forth above, this Court should affirm the District Court's grant of summary judgment in favor of VLS.

---

[13] *Serra* was a pre-VARA case, but the First Amendment analysis remains good law.

Dated:      June 10, 2022
              Montpelier, Vermont

/s/ Lia Ernst*
Lia Ernst
ACLU Foundation of Vermont
PO Box 277
Montpelier, VT 05601
(802) 223-6304
[lernst@acluvt.org](mailto:lernst@acluvt.org)

*Counsel for Amicus ACLU of Vermont*

\* Motion for admission to the Second Circuit Court of Appeals pending.

**CERTIFICATE OF COMPLIANCE**

I, Lia Ernst, Esq., counsel for Amicus, hereby certify the following:

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(1) and 29(a)(5) because it contains 3,536 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

2. This document complies with the typeface requirements of Fed. R. App. P 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) and because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Georgia 14-point font.